IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 109,353

STATE OF KANSAS,
*Appellee*,

v.

MICHAEL R. WILLIAMS,
*Appellant*.

SYLLABUS BY THE COURT

1.

Relevance is the threshold issue any time evidence is evaluated for admission into the record because all relevant evidence is admissible unless prohibited by statute. Evidence is relevant when it has any tendency in reason to prove any material fact. This definition incorporates two requirements—the evidence must be both material and probative. Evidence is material when the fact it supports is in dispute or an issue in the case and is probative when it has a logical tendency to prove a material fact. The question of materiality is reviewed de novo, and the assessment of probative value is reviewed under an abuse of discretion standard.

2.

When defense of another is claimed in response to criminal charges arising out of a death caused by the defendant, evidence of the victim's prior specific bad acts of violence is relevant to prove the defendant's state of mind at the time of the crime, *i.e.*, the defendant's honest and sincere belief that it was necessary to kill in self-defense, and to show that the belief was reasonable.

1

3.

Without at least some evidence tending to establish that at the time of the alleged defense of another, the defendant was aware of the victim's prior specific bad acts of violence, those acts are not relevant because they have no tendency in reason to prove any material fact.

4.

An instruction on a lesser included offense is not foreclosed because it is inconsistent with either the evidence presented by the defense or the theory advanced by the defense. A defendant is entitled to inconsistent defenses.

5.

When a jury convicts a defendant of premeditated first-degree murder when it had the option to convict the defendant of the lesser included crime of intentional second-degree murder, it is necessarily shown that the jury would have rejected the still lesser culpable mental state required for a conviction of voluntary manslaughter. Thus, any error in failing to give instructions on still lesser crimes is harmless.

6.

A prosecutor's comments during closing argument are considered in the context in which they were made, not in isolation. A prosecutor's colloquial use of "story" to refer to a defendant's testimony does not by itself imply either truth or fiction.

Appeal from Sedgwick District Court; GREGORY L. WALLER, judge. Opinion filed January 8, 2016. Affirmed.

*Michelle A. Davis*, of Kansas Appellate Defender Office, argued the cause, and *Deborah Hughes*, of the same office, was on the brief for appellant.

*Matt J. Maloney*, assistant district attorney, argued the cause, and *Marc Bennett*, district attorney, and *Derek Schmidt*, attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

STEGALL, J.:  A jury convicted Michael R. Williams of first-degree premeditated murder in the shooting death of his housemate, Sean Christopher Putnam. The district court imposed a hard 25 sentence.

FACTUAL AND PROCEDURAL BACKGROUND

In 2010, Williams lived in the same house with Deborah Weiss—who Williams described as his common-law wife—and with Putnam. On the evening of December 21, Williams called the police in an attempt to have Putnam evicted from the home, but the police refused. Later that evening, Williams shot Putnam in the head, killing him. A few days after that, Williams buried Putnam's body in a shallow grave. These facts were undisputed at trial; however, key details were contested.

*The State's Version of Events*

The State admitted into evidence a letter written by Troy Walker—Williams' friend—to the mother of Walker's children. In the letter, Walker describes a conversation in which Williams told Walker that he was going to kill Putnam because Putnam had informed Williams' boss that Williams was selling drugs at work. Detective Rick Craig interviewed Walker concerning the conversation described in the letter. According to Walker, Williams was angry at Putnam regarding a job he had received from Williams' employer. Williams was further angered because Putnam had told Williams' boss that Williams was selling "dope" out of the company truck. Because of this, Walker alleged

3

that Williams said of Putnam, "I'm going to fuck that dude up" and "I'm going to kill that pussy."

Justin Rose—Williams' neighbor—testified that in early December, Rose had seen a person offer to sell Williams a gun. In mid-December, Williams showed Rose the gun he had purchased and told Rose to keep it quiet because he did not want Putnam to know. Rose testified that at some point after Christmas, Williams came over to his house and described the shooting. Williams first told Rose, "I got rid of him." Rose asked what Williams meant by that, and Williams responded, "I shot him."

Rose did not immediately believe Williams. However, when Putnam's car (which was parked in Rose's driveway) did not move for several days—and especially after Rose observed Williams attempting to sell the car—Rose came to believe that Williams had in fact shot and killed Putnam. Eventually, Rose visited Williams' home and saw the carpet had been removed from Putnam's bedroom and the walls and floor were painted white. Rose noted "the strongest smell of bleach ever." At that point, Williams provided Rose with a more complete account of the shooting:

> "He said that they had gotten into a alt—a little argument. And that, I believe he said that [Putnam] was sitting on the edge of his bed. And when he looked down the hallway, . . . he seen [Putnam] flipping him off. And that's when he grabbed the gun and shot him."

Williams then told Rose that after he shot Putnam, Putnam "slunched over at the end of the bed and was making noises. And, at that point, [Weiss] went in there and tied a bungee cord around his neck." Williams told Rose he had buried Putnam in a tarp with the help of an "ex-con friend" at a house belonging to that friend's mother.

4

Edward Woods—Williams' coworker—testified that Weiss came to his home on the first or second of February 2011 and described the shooting. Weiss told Woods she had seen Williams and Putnam arguing and Williams shot him. She stated the argument was "over a drug deal." According to Woods, Weiss said, "I walked around the corner, and [Williams] come around the corner and shot the guy." Weiss claimed Putnam and Williams "had been arguing, or had an argument about something. And it was over, I guess, some type of a drug deal. And that I guess that wasn't the first time that they had been arguing." Weiss told Woods that after Putnam was shot she became upset and put a cord around his neck. According to Weiss, Putnam was "gurgling blood" at the time. Weiss told Woods they then wrapped the body in a tarp where it sat in a back room for a few days.

In addition to the pre-shooting conversation, the Walker letter also described a conversation between Williams and Walker that occurred after the shooting. In the letter, Walker tells his wife how a few weeks after Putnam's death, Walker observed Williams trying to sell Putnam's car to a third party. Walker asked Williams if the car was stolen, and Williams replied that it was not and it would never be reported stolen. Walker inquired further, and Williams said the car would not be reported stolen because Williams had "[s]hot [the owner] in his house and rolled the body up in carpet and got rid of it."

Terry Ockert—the man who eventually purchased Putnam's car from Williams—described to Detective Blake Mumma what Williams had told him of the shooting. Ockert claimed he purchased the car from Williams and, at the time, Williams said its previous owner had been killed. Williams told Ockert he had buried the body once and then had to dig it up and rebury it in order to remove a tarp that had been wrapped around the body. According to Ockert, Williams explained that he was "[p]issed off" after the police had refused to evict Putnam on the evening of the killing. Williams indicated he

5

was concerned Putnam was telling the police about crimes Williams "may or may not have been involved in."

Lee Sherard—the man who helped Williams bury Putnam—testified that he had arrived at a friend's house to find Williams and Weiss sitting together, visibly upset. Williams told Sherard that an animal had been killed and they needed help burying it. Sherard testified, "I treat my animals like my children. So I could see the distraught in both of them. So when he asked if I would help him, I said, Yes, that I would help him bury his dog." When they arrived at Williams' home, Sherard saw a large body covered with a tarp and he recognized what he believed to be a human foot sticking out from under the tarp.

At that point, Williams told Sherard that he had "shot a friend." Sherard helped Williams load Putnam's body into the back of Williams' truck, and they left to search for a burial site. After hours of unsuccessful searching, Sherard told Williams they could bury the body behind Sherard's mother's house. Sherard testified he assisted Williams because he was afraid and did not actually want Putnam's body buried behind his mother's house. When they arrived, Sharard went inside and left Williams to bury the body alone. The next day, Sherard observed part of the blue tarp protruding from the ground. He later confronted Williams with this fact. Putnam's body was eventually discovered behind Sherard's mother's house. It was buried approximately 7 inches deep and was no longer wrapped in a blue tarp.

Finally, Dr. Jaime Oeberst—the Sedgwick County district coroner—testified that Putnam's autopsy showed he had been shot in the head and had bruising to his neck. The bruising was consistent with injuries inflicted while Putnam was still alive. The gunshot wound entered through the left side of his forehead and exited the back of his scalp on the

6

right. Putnam's blood was found in the cracks between the floorboards in Putnam's bedroom.

*Williams' Version of Events*

In his defense at trial, Williams presented a very different version of the events culminating in Putnam's death. Williams testified that after the police left without evicting Putnam, Williams drove around for an hour or two and then went to Rose's house. Williams attempted to sell his gun to Rose in order to get money for a hotel room, but Rose refused to buy it. Later that evening, Williams returned home and fell asleep with the gun in his easy chair in the living room.

Williams testified he woke at around 11 p.m. to the sound of Weiss and Putnam screaming. Williams said he got up and saw Putnam holding Weiss by the hair. According to Williams, Weiss was naked and "I pulled the gun from my [waist] and I tell him to let go. He didn't pay no attention to me, he's holding her, he's looking at her and he's screaming at her and he's not listening to me. And I fired a shot at him." Williams then described how Putnam fell backwards into his bedroom.

On cross-examination, Williams said that before the shooting, "I tried pulling on her. I can't get her loose." Williams described, "He won't let go. He's pulling her back. I pulled the gun out. I point it at him and say, Let go. And with the other hand, I'm trying to pull on her. About the time he lets go, I fire." Williams then acknowledged he must have let go of Weiss long enough to pull the slide back on the gun in order to chamber a round before he pointed the gun at Putnam.

After the shooting, Williams "checked my wife out. She's naked. I asked her why she's standing there naked, what the Hell happened?" Williams testified Weiss told him

7

that she had taken a shower and forgotten a towel. When she came out of the bathroom, Putnam "had said something to her. And she had said something back or something. Then they had an argument. And that's why he grabbed her." Williams testified that at the moment he saw Putnam holding Weiss' hair, "I don't know what I thought, but I was scared. I was angry probably. I was probably—I don't know, I couldn't tell you exactly what went through my mind, you know. I just acted." Williams explained, "I thought he was going to hurt her. He told me how he was trained. He's told me how he's killed people. He's showed me pictures of being in the SWAT."

After assuring himself that Weiss was unhurt, Williams claimed he went to Rose's house for help but Rose was not home. When he returned, a bag was over Putnam's head. Weiss told him the bag was necessary to contain all of the blood. Williams took trash bags and bagged up everything with blood on it. He then stripped Putnam's body and wrapped it in a blue tarp. Putnam's body remained in the house for the next 2 days while Williams tried to decide how to dispose of it. Just before Christmas, Williams and Weiss were at a friend's house when they met Sherard, the man who would lead them to the spot where Williams buried Putnam's body.

Williams' entire defense strategy was pegged to his claim that when he shot Putnam, he had acted in defense of another—namely, Weiss. In support of this theory, Williams hoped to show the jury that Putnam was known to Williams as a fearsome killer with a short temper and a substantial history of violence against women. From Williams' perspective, two important pieces of this evidentiary puzzle were claims made by two different women that Putnam had either raped or attempted to rape them.

The first, M.M., was a mutual friend of Williams and Putnam. At trial, M.M. proffered the following testimony. On December 16, 2010, M.M. claimed that Williams and Putnam had thrown her a birthday party at their home. At one point during the party,

M.M. noted that Williams had gone outside and she decided to take a piece of birthday cake to Putnam's room, where he was lying down either depressed or "dope sick." Then, according to M.M.:

> "[Putnam] gets out of bed. And I'm looking at him, and he just kind of slams me down on the bed and holds me down. And I didn't know. It just caught me off guard, by surprise. And he starts undoing my shirt and pulled my shirt off. And he gets down to my jeans and starts pulling my jeans off. And the front door opens, and it's [Williams], and he's hollering, Hey. And [Putnam] jumps up and he says, Don't say a word about this. I mean, I was in total ow [*sic*] because he just went from nice and kind of depressed to a complete rage. And it just scared me. I mean, this is all like in a matter of seconds. I didn't know what to say."

The district court, however, disallowed the presentation of this evidence to the jury, reasoning that it was evidence of prior specific instances of conduct inadmissible pursuant to K.S.A. 60-447. M.M. was permitted to testify that in her opinion Putnam had a tendency towards violence and "was a good guy until he didn't get what he wanted. I mean, he went from nice to violent." She also stated that Putnam "went from a nice guy to a violent and rape guy."

The second woman, C.D., had alleged that sometime in the past, Putnam had raped her. However, C.D. was unable to provide any testimony—proffered or otherwise— because Williams and his defense team could not find her. Unbeknownst to them, C.D. was in fact in custody on a material witness warrant in an unrelated case. When Williams discovered that this is where C.D. had been during his trial, he moved for a new trial, alleging that the State had committed a *Brady* violation by withholding from Williams' defense lawyers information about C.D.'s allegations against Putnam and information about her whereabouts. The district court denied the motion on the grounds that the evidence would not have had any impact on the trial because it would have been

9

inadmissible for the same reason that M.M.'s specific allegation against Putnam was inadmissible.

At the conclusion of the evidence, Putnam requested lesser included instructions for intentional second-degree murder, voluntary manslaughter committed upon an unreasonable but honest belief that circumstances existed that justified deadly force, and voluntary manslaughter committed in the heat of passion. The court gave the first two instructions but declined to give the third, concluding that it was foreclosed by Williams' theory of defense that the killing had been lawfully committed in the defense of another. The jury returned a verdict of guilty of first-degree premeditated murder, and Williams was given a hard 25 sentence.

Williams now brings this appeal and asserts five claims: (1) The district court erred in ruling M.M.'s testimony inadmissible; (2) the district court erred in finding the State did not commit a *Brady* violation; (3) the district court erroneously failed to instruct the jury on the lesser included offense of voluntary manslaughter committed in the heat of passion; (4) prosecutorial misconduct occurred during closing arguments; and (5) cumulative error denied Williams the right to a fair trial. We exercise jurisdiction pursuant to K.S.A. 2014 Supp. 22-3601(b)(3), and, finding no reversible error, we affirm.

ANALYSIS

*The district court did not err in excluding M.M.'s proffered testimony.*

*Standard of Review*

"When a party challenges the admission or exclusion of evidence on appeal, the first inquiry is relevance." *State v. Walters*, 284 Kan. 1, 8, 159 P.3d 174 (2007). "Relevance is the threshold issue any time evidence is evaluated for admission into the

10

record because all relevant evidence is admissible unless prohibited by statute." *State v. Huddleston*, 298 Kan. 941, 959, 318 P.3d 140 (2014). Evidence is relevant when it has "any tendency in reason to prove any material fact." K.S.A. 60-401(b). "This definition incorporates two requirements—the evidence must be both material and probative. [Citations omitted.] Evidence is material when the fact it supports is in dispute or an issue in the case and is probative when it has a logical tendency to prove a material fact. [Citations omitted]." *Huddleston*, 298 Kan. at 959. The question of materiality is reviewed de novo, and the assessment of probative value is reviewed under an abuse of discretion standard. 298 Kan. at 959-60.

> "Judicial discretion is abused if judicial action (1) is arbitrary, fanciful, or unreasonable, *i.e.*, if no reasonable person would have taken the view adopted by the trial court; (2) is based on an error of law, *i.e.*, if the discretion is guided by an erroneous legal conclusion; or (3) is based on an error of fact, *i.e.*, if substantial competent evidence does not support a factual finding on which a prerequisite conclusion of law or the exercise of discretion is based." *State v. Ward*, 292 Kan. 541, 550, 256 P.3d 801 (2011).

"Once relevance is established, evidentiary rules governing admission and exclusion may be applied either as a matter of law or in the exercise of the district judge's discretion, depending on the contours of the rule in question." *State v. Gunby*, 282 Kan. 39, 47, 144 P.3d 647 (2006).

*Discussion*

Deciding whether M.M.'s excluded testimony can clear the first hurdle on the path to admission requires us to first review the law governing self-defense and defense of another. K.S.A. 2010 Supp. 21-3211 states:

11

"(a) A person is justified in the use of force against another when and to the extent it appears to such person and such person reasonably believes that such use of force is necessary to defend such person or a third person against such other's imminent use of unlawful force.

"(b) A person is justified in the use of deadly force under circumstances described in subsection (a) if such person reasonably believes that such use of deadly force is necessary to prevent imminent death or great bodily harm to such person or a third person."

Thus, self-defense and defense of another require evidence of the defendant's state of mind at the time of the killing:

"When self-defense is raised to criminal charges arising out of a death caused by the defendant, evidence of the victim's prior specific bad acts of violence and threats may be admitted to prove the defendant's state of mind at the time of the crime, *i.e.*, the defendant's honest and sincere belief that it was necessary to kill in self-defense, and to show that the belief was reasonable." *Walters*, 284 Kan. 1, Syl. ¶ 4.

Williams relies on the *Walters* rule to argue that the evidence of Putnam's alleged attack on M.M. should have been admitted into evidence to show Williams' state of mind. In *Walters*, the defendant was convicted of voluntary manslaughter. At trial, Walters argued he had shot the victim in self-defense as he believed the victim was reaching for a gun. Relying on K.S.A. 60-447, the district court excluded evidence of a 15-hour standoff between the victim and the Gardner police that had occurred 2 months before the shooting. Reversing the district court, the *Walters* court found the evidence was admissible and relevant to Walters' state of mind and should be admitted because: (1) Walters had referenced the Gardner standoff in his 911 call to police after the shooting; and (2) he had read newspaper articles and seen television accounts describing the incident. 284 Kan. at 11-12. Based on Walters' established knowledge of the standoff, the

12

court ruled the district court erred as a matter of law, thus abusing its discretion, when it excluded the evidence pursuant to K.S.A. 60-447. 284 Kan. at 12.

Just as in *Walters*, it would be error in this case to exclude evidence of prior bad acts pursuant to K.S.A. 60-447 if that evidence was relevant to prove Williams' state of mind at the time of the killing in question. But unlike *Walters*, the facts of this case demonstrate that the excluded evidence was not relevant to show Williams' state of mind at the time he shot Putnam. The record is entirely devoid of any evidence that Williams had any knowledge—at the time Putnam was killed—of the specific allegations against Putnam made by M.M.

Without at least some evidence tending to establish that Williams was aware of the allegations made by M.M., those allegations cannot be relevant to the disputed fact of Williams' state of mind at the time Putnam was shot. Even circumstantial evidence from which a reasonable juror could infer that Williams possessed knowledge of the allegations would be sufficient. The record here, however, is not amenable to such an inference.

M.M.'s testimony during her proffer indicates that only after Williams left the house during the birthday party did Putnam attack her. And Putnam withdrew his attack once Williams opened the front door and was "hollering, Hey." According to M.M., Putnam immediately ordered M.M. to never "say a word about this." M.M. gave no indication that she ever told Williams about the event. Williams himself certainly had the opportunity to provide evidence that he was aware of the allegation before he shot Putnam, but he never makes that claim.

Put simply, the record lacks any evidence establishing a nexus between the alleged prior bad act of the victim—Putnam in this case—and the defendant's state of mind at the

13

time the defendant claims to have acted in self-defense or defense of another. In these circumstances, the prior bad act of the victim is not relevant to a material fact and is not admissible under the rule established in *Walters*.

*Conclusion*

While the district court's ruling—hinged as it was exclusively on an application of K.S.A. 60-447—was incomplete, the district court reached the correct result because the excluded evidence was not probative of the material fact of Williams' state of mind at the time of the killing. See *State v. Prine*, 297 Kan. 460, 481, 303 P.3d 662 (2013) (affirming judgment as right for the wrong reasons). As such, we find no error.

*The district court did not err in denying Williams' motion for a new trial.*

*Standard of Review*

Pursuant to K.S.A. 2014 Supp. 22-3501, a district court may grant a new trial to a defendant "if required in the interest of justice." Appellate courts review such rulings for an abuse of discretion. *State v. Warrior*, 294 Kan. 484, 505, 277 P.3d 1111 (2012). Judicial discretion is abused if judicial action is either:  (1) arbitrary, fanciful, or unreasonable; (2) based on an error of law; or (3) based on an error of fact. *Ward*, 292 Kan. at 550.

In *Brady v. Maryland*, the United State Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady v. Maryland*, 373 U.S. 83, 87, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963). We have explained the *Brady* analysis this way:

14

"There are three components or essential elements of a *Brady* violation claim: (1) "'The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching" [citation omitted]'; (2) "'that evidence must have been suppressed by the State, either willfully or inadvertently" [citation omitted]'; and (3) the evidence must be material so as to establish prejudice." *Warrior*, 294 Kan. at 506.

"[A] trial court's determination as to the existence of a *Brady* violation is reviewed de novo with deference to a trial court's findings of fact, but the trial court's denial of the defendant's motion for new trial is reviewed under an abuse of discretion standard." *Warrior*, 294 Kan. at 510.

*Discussion*

Williams argued below—and repeats these arguments on appeal—that the State had knowledge of C.D.'s allegation of rape against Putnam and knew C.D.'s location as a prisoner in the State's custody. Further, he claimed that these facts were withheld from the defense. Williams concluded that had he known of C.D.'s claim and her location, her testimony would have been exculpatory to the extent it would buttress his theory that he shot Putnam in defense of Weiss.

The district court, having already excluded the specific allegations made by M.M. as discussed above, stated, "If this particular area of evidence complained of by the defendant had, in fact, been turned over by the State, I don't believe that the materiality test and the other tests set out by our Supreme Court could have, in fact, been reached." The district court reasoned that just as M.M.'s allegation was inadmissible pursuant to K.S.A. 60-447, so too would C.D.'s allegation be inadmissible. The substance of the district court's ruling was that even if Williams could establish the first two elements of a *Brady* violation, he could not establish materiality because of the application of K.S.A.

15

60-447. As above, the district court's rationale is legally incomplete as the district court failed to consider the possibility that C.D.'s allegation could be material and admissible under the rule established by *Walters*.

There is no dispute that agents of the State were aware of both C.D.'s allegations against Putnam as well as her physical location in State custody during Williams' trial. C.D., in discussing an unrelated case to a detective, stated she had once woken to Putnam having sexual intercourse with her without her consent. The interview occurred in January 2010. The State stipulated that a prosecutor who worked on the unrelated case became aware of that information but did not communicate it to the prosecutor in Williams' case. In May 2011, a private investigator working for Williams' defense began searching for both M.M. and C.D. based upon Williams' claims that Putnam had sexually assaulted both. He was unable to locate C.D., and she did not testify at Williams' trial. After Williams' trial, the investigator discovered that C.D. had testified in a different trial in November 2011 while being held in State custody as a material witness. Williams now argues that had he known the details of C.D.'s allegation against Putnam and known where she was, he could have introduced her testimony at trial thus proving his state of mind at the time he shot Putnam. Williams' counsel acknowledged below that any failure to disclose by the State appeared inadvertent.

In this case, we need not engage in an extended analysis of the various *Brady* factors, each of which must be shown to establish a violation. Simply put, Williams has failed to establish the materiality of C.D.'s allegation against Putnam. "'The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A "reasonable probability" is a probability sufficient to undermine confidence in the outcome.'" *Warrior*, 294 Kan. at 507 (quoting *United States v. Bagley*, 473 U.S. 667, 682, 105 S. Ct. 3375, 87 L. Ed. 2d 481 [1985]).

16

The State again points out that there is no evidence that Williams was aware of C.D.'s allegation against Putnam at the time of the killing. As such, that allegation is not probative of the material fact of Williams' state of mind. After a careful review of the record, we agree. Clearly Williams became aware of C.D.'s and M.M.'s statements at some point, but nothing in the record indicates he was aware of them at the time of the shooting. Williams had ample opportunity to lay that foundation, but he did not—presumably because the truth in this regard would have foreclosed his ability to even argue that the women's allegations against Putnam should be heard by the jury.

*Conclusion*

The district court's denial of Williams' motion for a new trial was not error. Williams failed to demonstrate a *Brady* violation because he cannot demonstrate the materiality of C.D.'s allegation to any contested issue in Williams' trial. In other words, Williams cannot establish a reasonable probability that had he known the details of C.D.'s allegation and her whereabouts, the result of his trial would have been different. While the district court—again basing its ruling exclusively on an incomplete application of K.S.A. 60-447—failed to consider the materiality of the evidence to Williams' state of mind at the time of the killing, the ruling was not error because the evidence was in fact immaterial. See *Prine*, 297 Kan. at 481 (affirming judgment as right for the wrong reasons).

*Even if error, the district court's failure to instruct the jury on the lesser included offense of voluntary manslaughter was harmless.*

*Standard of Review*

Our standard of review for jury instruction issues is well-established:

17

"For jury instruction issues, the progression of analysis and corresponding standards of review on appeal are: (1) First, the appellate court should consider the reviewability of the issue from both jurisdiction and preservation viewpoints, exercising an unlimited standard of review; (2) next, the court should use an unlimited review to determine whether the instruction was legally appropriate; (3) then, the court should determine whether there was sufficient evidence, viewed in the light most favorable to the defendant or the requesting party, that would have supported the instruction; and (4) finally, if the district court erred, the appellate court must determine whether the error was harmless, utilizing the test and degree of certainty set forth in *State v. Ward*, 292 Kan. 541, 256 P.3d 801 (2011), *cert. denied* 132 S. Ct. 1594 (2012)." *State v. Plummer*, 295 Kan. 156, Syl. ¶ 1, 283 P.3d 202 (2012).

*Discussion*

Williams argues the district court erred in failing to instruct the jury on the lesser included offense of voluntary manslaughter during the heat of passion or upon a sudden quarrel. Specifically, Williams argues the district court erred when it refused to give the requested instruction because it was contradictory to the evidence presented by Williams and with his theory of defense. The State concedes this was legally erroneous, and indeed, it was. An instruction on a lesser included offense is not foreclosed because it is inconsistent with either the evidence presented by the defense or the theory advanced by the defense. A defendant is entitled to inconsistent defenses. *State v. Tahah*, 302 Kan. 783, ___, 358 P.3d 819, 825 (2015); *State v. Simmons*, 295 Kan. 171, Syl. ¶ 3, 283 P.3d 212 (2012) ("The court's duty to instruct on lesser included crimes is not foreclosed or excused just because the lesser included crime may be inconsistent with the defendant's theory of defense.").

Because the district court erroneously concluded that the requested instruction was legally foreclosed by Williams' defense, the lower court never performed the necessary

18

analysis or answered the key question—whether there was sufficient evidence, viewed in the light most favorable to Williams, to support the requested instruction. The parties dispute whether the record supported the instruction. We find it unnecessary to address these factual disputes because, assuming the instruction was factually appropriate, we conclude there is no reasonable possibility the error affected the verdict. See *State v. Killings*, 301 Kan. 214, 223, 340 P.3d 1186 (2015) (assuming the instruction was factually appropriate and proceeding directly to harmless error analysis).

The State argues that the "skip rule" renders this error harmless. The substance of the skip rule is that "'[w]hen a lesser included offense has been the subject of an instruction, and the jury convicts of the greater offense, error resulting from failure to give an instruction on another still lesser included offense is cured.'" *State v. Horn*, 278 Kan. 24, 43, 91 P.3d 517 (2004) (quoting *Easter v. State*, 306 Ark. 615, 620, 816 S.W.2d 602 [1991]). More recently, we have cautioned that "the skip rule is not amenable to mechanical application" and "should be viewed as simply providing a route to finding harmless error in those cases in which the elements of the crime of conviction, as compared to a rejected lesser included offense, necessarily show that the jury would have rejected or eliminated a still lesser included offense." *State v. Hayes*, 299 Kan. 861, 866, 327 P.3d 414 (2014).

This is exactly the kind of case—as contemplated by the *Hayes* court—to which the skip rule reasonably (as opposed to mechanically) applies. The jury convicted Williams of premeditated first-degree murder when it had the option to convict of intentional second-degree murder. Such circumstances necessarily show that the jury would have rejected the still lesser culpable mental state required for a conviction of voluntary manslaughter. Thus, we conclude there "is no reasonable possibility the error affected the outcome." *State v. Greene*, 299 Kan. 1087, 1096, 329 P.3d 450 (2014).

19

*The State did not commit prosecutorial misconduct.*

*Standard of Review*

We review allegations of prosecutorial misconduct using a two-step process:

"We first decide whether the comments were outside the wide latitude a prosecutor is allowed, *e.g.*, in discussing the evidence. If so, there was misconduct. Second, if misconduct is found, we have said the court 'must determine whether the improper comments prejudiced the jury and denied the defendant a fair trial.' *State v. Bridges*, 297 Kan. 989, 1012, 306 P.3d 244 (2013) (citing *State v. Marshall*, 294 Kan. 850, 856, 281 P.3d 1112 [2012]).

"For years we have considered several factors in analyzing this second step: (1) whether the misconduct was gross and flagrant; (2) whether it was motivated by prosecutorial ill will; and (3) whether the evidence was of such a direct and overwhelming nature that the misconduct would likely have had little weight in the minds of jurors. No single factor controls the outcome of this inquiry. *Bridges*, 297 Kan. at 1012 (citing *Marshall*, 294 Kan. at 857)." *State v. Akins*, 298 Kan. 592, 599, 315 P.3d 868 (2014).

Should the appellate court find error, it then must determine whether the misconduct meets the dual standard of constitutional and statutory harmless error. See *Akins*, 298 Kan. at 599.

*Discussion*

At the start of the State's rebuttal portion of closing arguments, the prosecutor told the jury:

"That's right, the defendant didn't want to get caught then. And he doesn't want to get caught by you today. He is the only witness in this entire trial that has something to gain by *telling this story*. First, for the first time, not to his friends, not in detail about the grabbing of the hair in the hallway. It's not consistent with anything that Mike Williams told anybody, it was for you, so that he still won't get caught for what he did.

"Now, the challenge may be here. You are 12 men coming in to look at this case. You still have your common sense. You still have your common experience. And you still have your common knowledge to use with the evidence in this case. *And the defendant has all of the advantages of today or yesterday, if you will, painting, painting it.* Because Christopher Putnam is not here to tell us what happened because the defendant made sure of that in extreme detail." (Emphasis added.)

The prosecutor then went on to discuss the testimony of Justin Rose:

"Justin has nothing to gain by coming in here, had nothing to gain. Again, the only one that has something to gain, is the man right here (indicating), by telling you, or *painting the story as it best fits* so he won't be held fully accountable." (Emphasis added.)

After further discussion of the conflicting statements, the prosecutor said:

"Oh*, if you were to somehow buy into this, which he wants you to do, buy into the idea* that he was just defending Deborah Weiss, then why not call the cops? Why not call the cops? That's not righteous. I'm righteously allowed to shoot this man. I don't want to call the cops, so instead I want to remodel the bedroom where I killed him? I want to dig up the ground behind someone else's mom's house? And then, when he has the first opportunity—*even if you buy that*—first opportunity when the cops come knocking, say, I hate him, but I didn't kill him? No, you stand up like a man and you say, I was defending a woman. No, that's not a man, that's a coward, self-centered plan of action, to hide, to hide everything. The premeditation continues from the time he shot him to the time he and Deborah Weiss made sure he was dead. That's not self-defense or defense of another. It's not voluntary manslaughter. And it's not intentional second. It's premeditated

21

first-degree murder. Hold him fully accountable for what he did. Do not be confused. *Test his story and the motivation to telling you something other than what is accurate*." (Emphasis added.)

A prosecutor commits error by "commenting on witnesses' credibility—specifically, calling defendants or defense counsel liars during arguments to the jury." *State v. Harris*, 297 Kan. 1076, 1088, 306 P.3d 282 (2013). Euphemistically calling a defendant a liar is treated no different. See *State v. Elnicki*, 279 Kan. 47, 63, 105 P.3d 1222 (2005) (Prosecutor calling defendant's statement a "'fabrication,' 'yarn,' 'final yarn,' and 'the yarn spun here, the four-part yarn' . . . were unquestionably outside the wide latitude allowed in discussing the evidence.").

Williams contends the State euphemistically called him a liar in four distinct ways: (1) by repeatedly referencing Williams' "story"; (2) by alleging several times that Williams was "painting" his story to fit the evidence; (3) by using the phrase "buy into" several times when asking whether the jury would believe Williams' testimony; and (4) the State's summation to the jury to "[t]est his story and the motivation to telling you something other than what is accurate."

Recently, we addressed a prosecutor referring to a defendant's statements as a "story" in *State v. Brown*, 300 Kan. 542, 558, 331 P.3d 781 (2014). In that case, the prosecutor told the jury, "'Remember the things [Brown] says because they're not consistent—her tale that she happened upon the car after it crashed.'" 300 Kan. at 558. Later on, the prosecutor said of the defendant:

> "'Now, she's had two years, a little over—two years and three months to come up with a
> story about how she's going to explain that to the jury. How am I going to explain my
> DNA in the car? How am I going to explain my fingerprint in that car?

"'She had all weekend this past weekend to decide how she's going to respond to all of the evidence that she heard here in the courtroom last week. And she comes up with this story that she's trying to help Scott Sappington, that she just happened upon this car wreck and saw him there, went to the driver side around to the passenger side, opened it up because that will explain DNA and my fingerprint.'" *Brown*, 300 Kan. at 558-59.

We found that referring to Brown's testimony as a "tale" and "story" was colored by the State's simultaneous argument that the defendant had to "decide" how to respond "because an honest person does not have to 'decide' what the truth is." 300 Kan. at 561. Juxtaposing the descriptor "story" over and against "the truth" does euphemistically call the defendant a liar, and we found those statements were error. 300 Kan. at 561. We noted, however, "[t]he comments are considered in the context in which they were made, not in isolation." 300 Kan. at 560. The context here distinguishes this case from *Brown*.

Here, the State's references to a "story" regarding Williams' testimony do not euphemistically refer to lying. The use of "story" does not by itself imply either truth or fiction. It may simply be a colloquial reference to a witness' statement or testimony. On occasion, we have even used the word "story" in our opinions to refer to witness statements. See, *e.g.*, *State v. Baker*, 281 Kan. 997, 1014, 135 P.3d 1098 (2006) ("The prosecutor in this case did not call Baker's *story* a yarn or a tall tale . . . ." [Emphasis added.]). Without any additional implication or context suggesting that Williams' "story" was a lie, we do not find the State's use of the word "story" to be error.

The prosecutor's references to whether the jury would "buy into" Williams' testimony also do not imply Williams was lying. Whether a jury "buys" testimony is another colloquialism synonymous with whether a jury "believes" certain testimony. The jury is the finder of fact and must by necessity resolve conflicting evidence—*i.e.*, the jury must decide who to believe. It is not error to tell the jury—even colloquially—that it must

23

weigh the evidence and make any necessary credibility determinations to resolve conflicting evidence.

Next, Williams objects to the prosecutor's argument to the jury that Williams was "painting" his testimony to fit the evidence. In *State v. Davis*, 275 Kan. 107, 122, 61 P.3d 701 (2003), we held such arguments to be within the wide latitude afforded prosecutors when discussing the evidence. There, we found no error in the State's argument that a witness' contemporaneous statements are "'more likely the truth than something that comes ten months later with plenty of time for reflection and creation.'" 275 Kan. at 122. It is not error for a prosecutor to direct the jury to the evidence and to rhetorically ask the jury which version of events—as between the defendant's pretrial statements and his tailored trial testimony—is more credible.

The prosecution's final statement to the jury to "[t]est his story and the motivation to telling you something other than what is accurate," while less than articulate, simply asks the jury to weigh Williams' testimony against the other evidence presented. This kind of argument is permissible and is not error. See *State v. Nguyen*, 285 Kan. 418, 425, 172 P.3d 1165 (2007) ("A prosecutor is certainly afforded the latitude to ask the jury to look at the evidence ('put your heads together') and enter a verdict which is consistent with that evidence and which will then be, by definition, consistent with justice.").

Taken both individually and as a whole, the prosecutor's statements in this case were reasonably within the wide latitude granted to prosecutors. We find no misconduct.

*Cumulative error did not deny Williams a fair trial.*

Finally, Williams contends that cumulative error denied him a fair trial and requires reversal. The test for cumulative error is "'whether the totality of circumstances

substantially prejudiced the defendant and denied the defendant a fair trial. No prejudicial error may be found upon this cumulative effect rule, however, if the evidence is overwhelming against the defendant.'" *State v. Edwards*, 291 Kan. 532, 553, 243 P.3d 683 (2010) (quoting *State v. Ellmaker*, 289 Kan. 1132, Syl. ¶ 12, 221 P.3d 1105 [2009]). "The presence of one error is obviously insufficient to accumulate." *State v. Houston*, 289 Kan. 252, 277, 213 P.3d 728 (2009). Here, we presumed one harmless error and rejected Williams' remaining claims of error. In these circumstances, no cumulative error can occur.

Affirmed.