NOT DESIGNATED FOR PUBLICATION

No. 120,067

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

VINCENT L. RANSOM,
*Appellant*.

MEMORANDUM OPINION

Appeal from Sedgwick District Court; TERRY L. PULLMAN, judge. Opinion filed April 17, 2020. Affirmed.

*Kristen B. Patty*, of Wichita, for appellant.

*Matt J. Maloney*, assistant district attorney, *Marc Bennett*, district attorney, and *Derek Schmidt*, attorney general, for appellee.

Before LEBEN, P.J., SCHROEDER, J., and LAHEY, S.J.

PER CURIAM: Vincent L. Ransom appeals the denial his motion for a new trial, alleging a *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963), violation occurred when the State failed to disclose potentially beneficial evidence contained in a police report in preparation for his jury trial. He claims the district court abused its discretion when it denied his motion and found the failure to disclose the evidence did not result in a *Brady* violation as a matter of law. We agree with the district court; the evidence was not so material as to change the outcome of the verdict. We affirm.

1

Ransom was charged with two counts of aggravated robbery, two counts of aggravated battery, and criminal possession of a firearm. He pled not guilty to all counts and was bound over for trial. Ransom's alleged accomplice, Shawn Darnell, and the victims, Nikki and Allen Stowe, gave eyewitness testimony about the events on the morning of April 1, 2017. Ransom also testified claiming he had an alibi.

*The State's version of events*

Darnell identified Ransom in the courtroom as his accomplice to the robbery. He testified that on the night of March 31, 2017, he made plans with Ransom to rob a drug house. The robbery was initially Ransom's idea, and Darnell chose Nikki and Allen's house in Valley Center as the location. Although Darnell did not know them personally, he had been to the house previously and waited outside as other friends went inside to buy drugs.

Between 5 a.m. and 6 a.m. the next morning, Darnell and Ransom met at Melissa Webb's apartment in Winfield. Webb drove them to Wichita in her silver Camaro. When they got into town, they stopped at the Walmart on North Rock Road. Darnell and Webb went inside, and Darnell stole a package of zip ties to use for the robbery. Webb drove them to Ransom's friend's house where Ransom picked up the guns he would use for the robbery. Darnell waited inside the car, and Ransom came out with a sawed-off shotgun and a 9mm handgun.

Webb then drove them to Nikki and Allen's house in Valley Center. She parked the Camaro beside a truck and van in the Stowes' driveway. Webb waited in the car while Darnell and Ransom kicked in the front door. Darnell went inside first, and Ransom followed behind him. Darnell went into the Stowes' bedroom and saw Nikki and Allen

lying in bed. They yelled at Darnell and asked him what he was doing. Darnell pointed his gun at them and demanded their drugs and money.

Around that time, Ransom entered the bedroom with a younger man who was living at the Stowes'. Ransom had the man secure Allen's hands behind his back with zip ties. Ransom then cinched the zip ties tight and hit the younger man on the head with his shotgun. Meanwhile, Nikki sat up on the bed and was extremely combative and mad. Darnell started to argue with Nikki, and Ransom left the bedroom.

Darnell testified there was a whole lot going on in the bedroom. Out of the corner of his eye, Darnell saw Nikki grab something. He turned to face Nikki and saw her waving a pistol she had in her hand. Darnell dove onto the bed and got his hand on Nikki's gun. Nikki grabbed the back of Darnell's head and pulled him down on her. Initially, Darnell still had his gun in his hands, but at some point, he dropped it on the bed or on the floor.

Darnell testified Nikki's pistol went off and hit him in his left hand. He yelled and Ransom came back into the bedroom. At that point, Darnell was standing up in front of the bed. According to Darnell, Ransom fired his gun a few times. Both Nikki and Allen had been shot. Darnell said Nikki was lying there and was no longer saying anything, but Allen was screaming loudly. Allen fell onto the floor with his hands still secured behind his back.

Darnell asked the younger man where the dope was, and the man pointed to a set of drawers in the bedroom. Darnell found a bag of methamphetamine inside the drawer. Allen yelled that he had cash in his wallet on the floor. Darnell and Ransom left after taking the methamphetamine, Allen's wallet, and a laptop. In the car, Darnell and Ransom divided up the methamphetamine and the cash. Darnell asked Ransom and Webb if they wanted to go to Kansas City to get away. Webb started driving north, and at different

3

times, Darnell and Ransom threw their phones, Allen's wallet, and the laptop out of the car window. Darnell laid down in the back of the car because his hand was throbbing. A few hours later, he saw Webb had missed the exit for Kansas City and they were headed for Lincoln, Nebraska.

The group rented a room at a motel in Lincoln. The State introduced into evidence surveillance footage taken at the motel's parking lot and played the video for the jury. The video shows a silver Camaro parked in the motel parking lot. At first, a woman gets out of the car. Later footage from a different angle shows the car being parked in front of a motel room. A thinner-looking man with a noticeable limp gets out of the car and walks into a motel room. Later in the video, a different man—heavier than the first—gets out of the car and walks into the room with a straight leg.

Darnell identified himself as the man walking with a limp. He said he had walked with a limp because his leg had seven screws in it and he had waited too long to get it replaced. Darnell identified Ransom as the heavier man walking with a straight leg. He said Ransom was walking like that because he had a shotgun down his pants. Darnell said he and Ransom both took their guns inside the motel room. They left the motel the next day, and Darnell and Webb dropped Ransom off at his sister's house in Wichita. Darnell said Ransom took the sawed-off shotgun and the handgun with him. Darnell and Webb went to Webb's apartment in Winfield.

Darnell was arrested at Webb's apartment on April 7, 2017. He had hidden the handgun he used during the robbery behind a couch at Webb's place. During an interview with Detectives Jon Gill and Christopher Hambrick, Darnell described the robbery in detail and identified Ransom as his accomplice. He told them where to find the gun he had used and the location of the Walmart in Wichita where he had stolen the zip ties. Based on his interview statements, police recovered the handgun Darnell had hidden, and Gill reviewed surveillance footage from the Walmart in Wichita which showed a silver

4

Camaro in the parking lot and Darnell and Webb inside the store. Newton police officers found two wallets containing the Stowes' information near an exit off I-135.

Later that day, Ransom was taken into custody at his sister's house. Police found a 9mm handgun in Ransom's jacket pocket and a sawed-off shotgun in the truck Ransom had been driving shortly before he was arrested.

Darnell testified he reluctantly told the detectives Ransom was his accomplice and Ransom shot Nikki and Allen. When asked why he was reluctant to disclose Ransom's identity, Darnell said, "I knew I was going to end up in prison and the ramifications from, you know, cooperating was just going to follow me the whole time." He went on to say: "When you go to prison . . . everybody knows who has told . . . . You can't get away from that . . . I knew what I had to look forward to, so I was kind of reluctant."

The Stowes' testimony about the robbery tracked with Darnell's testimony. The only point of fact on which Nikki's testimony significantly differed was whose gun went off during her physical altercation with Darnell. Nikki testified Darnell's gun went off during the struggle, hitting both of them. She said she tried to shoot Darnell in his belly but her gun did not fire. Allen testified that after the two men left, he could see from the video surveillance in his bedroom a silver Camaro parked in the driveway.

Justin Rankin, a forensic scientist at the Regional Forensic Science Center in Wichita, examined the 9mm handgun recovered from Webb's apartment and the 9mm handgun recovered from Ransom's jacket pocket. He determined both guns functioned properly. He testified when a bullet is fired, the barrel of a firearm imparts groves onto the bullet or shell casing unique from any other firearm. After test-firing both guns, he compared the unique markings on the shell casings from the test fires to the six casings recovered from the Stowes' bedroom. He determined two of the six casings were fired

5

from the handgun recovered at Webb's apartment, while the remaining four were fired from the gun recovered from Ransom's jacket pocket.

*Ransom's alibi and version of events*

Ransom's defense hinged on his alibi. He claimed he was asleep at his sister's house while the robbery at the Stowes' house took place. Ransom testified Darnell and Webb stopped by his sister's house around 9 a.m. on April 1, 2017. He was sleeping on the couch when his sister woke him up and told him "the white dude was outside." Ransom said the day before he and Darnell had made plans to go to a casino in Kansas City. When Ransom went outside to meet Darnell, he saw Darnell holding his hand which was wrapped up and there was blood everywhere. Ransom asked Darnell what had happened, and Darnell told him he had been shot. But Darnell did not go into detail about it.

Darnell asked Ransom if he still wanted to go to Kansas City and to hold something for him. Darnell handed him something wrapped up in a shirt, but he did not tell Ransom what the items were or why he wanted Ransom to hold them. Ransom did not unwrap the shirt. Although he could feel them, he didn't know exactly what they were. Ransom put the items in a closet at his sister's house. He said he agreed to take the items because Darnell was his friend and he needed help. After that, Ransom left with Darnell and Webb for Kansas City.

In the car, Ransom started to ask Webb what had happened earlier, but he could not get a straight answer. He said the three of them ended up at a motel in Nebraska because Webb got lost. According to Ransom, Darnell was throwing a lot of things out of the car, but he did not know exactly what they were. At the motel, they started filling Ransom in on what had happened. Darnell told him the items he had given him were guns. Ransom asked Darnell to take him home because he did not want to be with

6

Darnell if the police were looking for him. On cross-examination, Ransom agreed Darnell had correctly identified him in the surveillance video taken outside the Nebraska motel.

Darnell and Webb dropped off Ransom at his sister's house in Wichita the next day. Ransom said he tried to give the guns back to Darnell, but Darnell wanted to come back and get them after he dropped Webb off in Winfield. Six days later, Ransom learned detectives were looking for him and he would be taken into custody. So, Ransom took the guns from his sister's house and put the sawed-off shotgun in his jacket sleeve and the handgun in his jacket pocket. He went inside his girlfriend's truck and placed the shotgun on the floorboard in the passenger's side in the back; however, before he could get the other gun out, an officer told him to step out of the truck. Ransom said he had planned on throwing the guns down a drain somewhere.

Ransom's sister, Kamilla Ransom, also testified and corroborated some of Ransom's testimony. She said Ransom was sleeping on her couch when Darnell arrived. Kamilla said Ransom called her later that night and told her he had stored guns in her house. She also saw Ransom take the guns to his friend's car. In the year between Ransom's arrest and the jury trial, she did not tell law enforcement Ransom was asleep at the time of the crimes because no one ever asked.

*The Stowes' description of the men who robbed them*

Both Allen and Nikki testified they had never met the men who robbed them. According to the Stowes, the first man who entered their bedroom was white and the second man to enter was black. Allen described the white man as around five feet nine inches tall, skinny, with short hair, and was wearing a long shirt. Nikki said the white man weighed around 170 pounds, had really short hair, and some tattoos. Allen said the black man was around six feet, had a stocky build, and was wearing a hoodie. Like Allen, Nikki said the black man was heavier than the white man and was wearing a hoodie or a

7

sweatshirt. Allen testified he had never previously identified Ransom as the black coparticipant. However, on cross-examination, defense counsel asked him, "Are you able to sit here today and say that this is the man who was in your home?" Allen replied, "Yes. We looked each other in the eye when he leaned over and took my laptop." Nikki identified Ransom in the courtroom as the black man who robbed her.

Soon after Nikki identified Ransom in the courtroom, the prosecutor asked Nikki, "So when you identified the defendant in court, how did you know he was the one that shot you?" Nikki responded, "Because I saw his face on Facebook, and you don't forget that face." On cross-examination, Nikki clarified she had looked up Ransom's picture on Facebook after she heard his name on the news, testifying as follows:

> "[Defense counsel]: And it's your testimony today that, shortly after Mr. Darnell and Mr. Ransom's arrests, that you spoke to Detective Hambrick and identified my client. That's your testimony?
>
> "[Nikki]: Darnell had been arrested first. [Ransom] was arrested a couple of days later, if I remember correctly. . . . I showed them pictures of somebody that I believed that it might be, possibly, as the—I don't know. But when I saw his face—
>
> "[Defense counsel]: You're talking about my client?
>
> "[Nikki]: —after I got the name, after I heard that they had been arrested, I looked them up to see if that was who it was. And yes, ma'am, it definitely was.
>
> "[Defense counsel]: Okay.
>
> "[Nikki]: You don't forget the face that shoots at you and tries to kill you.
>
> "[Defense counsel]: And when you saw his face, you saw that face on the news?
>
> "[Nikki]: No, ma'am.
>
> "[Defense counsel]: Where did you see the face?
>
> "[Nikki]: On Facebook.
>
> "[Defense counsel]: Well, how did you see the face —I mean, how did you know what to look up?
>
> "[Nikki]: After they were arrested, it was on the news. Their names were on the news and in the papers.
>
> "[Defense counsel]: Okay.

"[Nikki]: So I looked him up.

"[Defense counsel]: So it was after he was arrested, you heard the name, looked him up on Facebook, saw his picture, and said that's him.

"[Nikki]: Yes, ma'am.

"[Defense counsel]: And it's your testimony you gave that information to Detective Hambrick after you did that?

"[Nikki]: Honestly, ma'am, I'm not sure if I—once I knew they were arrested, once I had the names, once I looked his face up, then, yes, I said. 'Yes. That's him.'

"[Defense counsel]: Okay. To a police officer?

"[Nikki]: Yes.

"[Defense counsel]: And you believe it was Hambrick?

"[Nikki]: I believe so. Yes."

Later in the trial, Gill's testimony controverted Nikki's testimony about her out-of-court identification of Ransom. According to Gill, at some point before Darnell's arrest, Nikki had shown him a picture of a man—other than Ransom—whom she thought was the black man who robbed her. Gill followed up on the lead and observed the house he believed was associated with that person. He said the investigation was pointed in a different direction than the person that Nikki identified when they talked to Darnell, who gave them Ransom's name.

On cross-examination, defense counsel asked Gill whether Nikki had shown him a picture of someone *other than Ransom*, but she did not ask Gill specifics about the other person Nikki had identified. Defense counsel then asked Gill, "Did you ever get any information from Mr. and Mrs. Stowe in which they *identified* [*Ransom*]?" (Emphasis added.) Gill responded, "It was not—it would not have been proper for me to have Nikki or Allen Stowe identify [Ransom]." On redirect, the prosecutor asked Gill what he meant when he said it would not have been proper for the Stowes to identify Ransom. Gill responded, saying the Stowes "had viewed pictures of people that we arrested before we got to them," so their identification of Ransom would have been tainted. He testified the

9

Stowes were not asked to identify either Darnell or Ransom in a photo array, because "[t]hey would identify them based on suggestion."

After a four-day trial, the jury convicted Ransom of all counts. Before sentencing, Ransom filed a motion for a new trial based on newly discovered evidence. The district court addressed his motion at sentencing. Defense counsel told the district court after the trial she had discovered a report from Gill in which he alleged Nikki had shown him social media photos of a man known as K.J. whom she was 99.9% sure was the black man who robbed her. Defense counsel argued the State violated *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed.2 d 215 (1963), when it failed to disclose the evidence before trial.

The prosecutor conceded Gill's report had not been turned over to the defense before trial. She explained both parties were surprised when Nikki appeared to testify on cross-examination that she had previously told Hambrick that one of the men who robbed her was Ransom. After Nikki's testimony, the prosecutor called Hambrick during a recess. Hambrick told her Nikki had shown Gill a Facebook picture of a man other than Ransom. The prosecutor had both detectives come to court. The detectives relayed the conversation to defense counsel in chambers. Gill testified at trial after that conversation took place.

The district court denied Ransom's motion. The court found Nikki's identification of a man—other than Ransom—as the black man who robbed her came out for the first time at trial. Although defense counsel had a chance to cross-examine Gill on the subject, the district court found defense counsel was denied the benefit of investigating Gill's report and preparing for trial based on the report. But the district court determined even if defense counsel would have had Gill's report before trial, it would not have produced a different result. The district court emphasized there was substantial corroborating evidence independent of Ms. Stowe. Based on the district court's independent recollection

of the trial, it found Darnell to be "a very credible witness and his version or recollection of the incident [was] far more consistent, credible and corroborated with other facts than Mr. Ransom's testimony."

Ransom was sentenced to a controlling sentence of 323 months' imprisonment. Ransom timely appeals.

ANALYSIS

*No abuse of discretion to deny Ransom's motion for new trial*

On appeal, Ransom argues the district court abused its discretion when it denied his motion for a new trial in which he alleged the State violated *Brady*. We review the district court's determination regarding the existence of a *Brady* violation de novo with deference given to the district court's factual findings. "And the denial of the defendant's motion for new trial is reviewed under an abuse of discretion standard." *State v. DeWeese*, 305 Kan. 699, 709, 387 P.3d 809 (2017).

"'A district court abuses its discretion if its decision is (1) arbitrary, fanciful, or unreasonable; (2) based on an error of law; or (3) based on an error of fact.'" *State v. Butler*, 307 Kan. 831, 852, 416 P.3d 116 (2018). The party arguing the court abused its discretion has the burden of proving such an abuse of discretion. See *State v. Thomas*, 307 Kan. 733, 739, 415 P.3d 430 (2018). Here, that burden is Ransom's, and he argues the district court made an error of law when it found Gill's report was immaterial under *Brady*.

In *Brady*, the United States Supreme Court held prosecutors have a duty to disclose evidence favorable to the accused when the evidence is material either to guilt or to punishment, regardless of the prosecutor's good faith or bad faith in withholding the

evidence. 337 U.S. at 87. Prosecutors' duty to disclose evidence favorable to the accused encompasses both exculpatory and impeachment evidence. *State v. Warrior*, 294 Kan. 484, 505-06, 277 P.3d 1111 (2012).

To establish a *Brady* violation three essential elements must be shown: "(1) the evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; (2) that evidence must have been suppressed by the State, either willfully or inadvertently; and (3) the evidence must be material so as to establish prejudice. " *State v. Lyman*, 311 Kan. 1, 19, 455 P.3d 393 (2020).

Here, the second *Brady* element is not at issue. The State admits Gill's report was not turned over to the defense before trial. The State does not directly address the first *Brady* element in its brief. That said, Ransom argues the report would have been favorable to him for the impeachment of Nikki given her testimony at trial that "[y]ou don't forget the face that shoots at you and tries to kill you."

Unquestionably, Gill's report contained evidence relevant to Nikki's credibility. Nikki was certain in her testimony Ransom was the black man who robbed her. But in Gill's report, Nikki allegedly stated she was 99.9% sure K.J.—not Ransom—was the black accomplice. Had the State disclosed Gill's report before trial, defense counsel could have used the report to attack Nikki's confident assertion Ransom was Darnell's accomplice. See *Warrior*, 294 Kan. at 511 (impeachment evidence included witness initially identifying person other than coparticipant as shooter).

But even if we assume Gill's report is favorable to Ransom under the first *Brady* element, his argument fails under the third element. Ransom must also establish the undisclosed evidence is "material so as to establish prejudice." *Lyman*, 311 Kan. at 19. He has not done so.

12

The materiality standard applicable under *Brady* is narrow. "'The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A "reasonable probability" is a probability sufficient to undermine confidence in the outcome.'" *State v. Williams*, 303 Kan. 585, 597, 363 P.3d 1101 (2016). In other words, the newly disclosed evidence must put the whole case in such a different light as to undermine confidence in the verdict. See *Warrior*, 294 Kan. at 511.

Ransom argues Gill's report could reasonably be taken to put the whole case in a different light. But the only support he provides for his argument is how he would have used the evidence if he had it before trial; he does not explain why the report is sufficient to put the whole case in a different light. The State responds the report is not material because the crucial identification evidence came not from Nikki or her husband, but from Darnell. The State reasons: "In light of law enforcement testimony that Nikki identified somebody other than [Ransom] as the assailant, it strains credulity to believe the jurors placed significant faith in any out-of-court identifications made by Nikki." We find the State's reasoning persuasive.

At most, Nikki's statement in Gill's report would have only reinforced impeachment evidence already presented to the jury. Gill testified Nikki had previously identified someone other than Ransom as the black man who robbed her. Defense counsel could have pressed the point more during Gill's cross-examination, but she failed to do so. We agree had defense counsel known about Nikki's statement in Gill's report, she could have specifically questioned Gill about Nikki's certainty K.J. was the black coparticipant and not Ransom. Under these facts, even if the report had been disclosed, Nikki's alleged statement would have been cumulative to the testimony presented at trial reflecting that Nikki's identification of the black coparticipant had changed over time. See *DeWeese*, 305 Kan. at 712 ("The materiality calculus includes acknowledging that when the undisclosed evidence merely reinforces evidence already presented to the jury . . . the

13

new evidence is considered cumulative and the prosecution's withholding it does not qualify as a *Brady* violation.").

The trial record shows Nikki's identification of Ransom was not at the heart of the State's case. The jury heard Gill testify the detectives on the case did not rely on the Stowes' identification of Darnell's accomplice because they "had viewed pictures of people that we arrested before we got to them." He testified the Stowes were not asked to identify Ransom in a photo array because they would have done so based on suggestion. Instead, the trial record shows Darnell's interview testimony and identification of Ransom guided the State's investigation and prosecution of Ransom from beginning to end. Darnell identified Ransom in court as his accomplice. As the State points out, the outcome of the trial hinged on whether the jury believed Darnell.

Darnell gave eyewitness testimony at trial. The same district judge who ruled on Ransom's motion for new trial presided over Ransom's trial. Based on the district court's independent recollection of the trial, it found Darnell to be a more credible witness than Ransom. The trial record shows Darnell's testimony was well corroborated by other evidence:

- Surveillance footage taken from the motel in Lincoln showed a heavier looking man walking into a motel room with a straight leg;
- At the time of his arrest, Ransom was in possession of a sawed-off shotgun and a 9mm handgun, the two guns Darnell said Ransom used during the crime;
- Four of the six shell casings recovered from the Stowes' bedroom were fired from the handgun found in Ransom's jacket pocket;
- Gill observed surveillance footage depicting Darnell and a silver Camaro at a Walmart in Wichita; and
- Police in Newton recovered the Stowes' wallets that Darnell said were thrown out of the vehicle as the group left Wichita.

The district court agreed with Ransom that Gill's report should have been provided to allow defense counsel to investigate the report in preparation for trial and for use during the trial. But Ransom has not shown the evidence was so material as to cause prejudice. Given the record as a whole, there is no reasonable probability timely providing Gill's report to the defense would have resulted in a different verdict. The untimely disclosed evidence does not put the whole case in such a different light as to undermine confidence in the verdict. See *Warrior*, 294 Kan. at 511. Accordingly, we find no error of law when the district court found the failure to provide Gill's report did not cause a *Brady* violation sufficient to grant Ransom's motion for a new trial. We affirm the district court's denial of Ransom's motion.

Affirmed.