IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 121,284

STATE OF KANSAS,
*Appellee*,

v.

CASIMIRO NUNEZ,
*Appellant*.

SYLLABUS BY THE COURT

1.

K.S.A. 2020 Supp. 21-5231 creates a true immunity that prevents the State from criminally prosecuting individuals who are statutorily justified in their use of force.

2.

To effectuate immunity under K.S.A. 2020 Supp. 21-5231, district courts must perform a gatekeeping function and insulate these qualifying cases from continued prosecution and trial. A defendant invokes the district court's gatekeeping function by filing a motion under the statute, which then imposes a burden on the State to come forward with evidence establishing probable cause that the defendant's use of force was not statutorily justified.

3.

When considering a motion under K.S.A. 2020 Supp. 21-5231, a district court must consider the totality of the circumstances, weigh the evidence before it without

1

deference to the State, and determine whether the State has carried its burden to establish probable cause that the defendant's use of force was not statutorily justified.

4.

A district court is to follow a two-step process when making probable cause determinations on pretrial immunity motions. First, the district court must make findings of fact based on the stipulations of the parties and evidence presented at the hearing, along with any reasonable inferences therefrom. Second, the district court must then reach a legal conclusion as to whether the State has met its probable cause burden based on the court's factual findings.

5.

A district court is not required to make any particularized findings when ruling on an immunity motion, but it must be apparent from the record that the district court not only recognized, but also applied, the appropriate legal standard in reaching its probable cause determination.

6.

Under K.S.A. 2020 Supp. 21-5405(a)(4), involuntary manslaughter in the form of imperfect self-defense, that is, killing based on a lawful act committed in an unlawful manner, may be characterized as a lawful exercise of self-defense, but with excessive force.

7.

The crime of imperfect self-defense involuntary manslaughter contains an element not contained in second-degree murder or voluntary manslaughter: lawfully acting in self-defense but in a manner made unlawful through the exercise of excessive force.

Appeal from Sedgwick District Court; KEVIN O'CONNOR and STEPHEN J. TERNES, judges. Opinion filed May 14, 2021. Reversed and remanded.

*Korey A. Kaul,* of Kansas Appellate Defender Office, argued the cause, and was on the brief for appellant.

*Matt J. Maloney*, assistant district attorney, argued the cause, and *Marc Bennett,* district attorney, and *Derek L. Schmidt*, attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

ROSEN, J.: Casimiro Nunez appeals from his conviction by a jury of one count of premeditated first-degree murder and one count of possession of methamphetamine with intent to distribute. Finding error in the instructions the jury received, we reverse the murder conviction and remand for proceedings consistent with this opinion.

FACTS

At 2:35 in the morning of October 29, 2016, the Wichita emergency services dispatcher received a 911 call in broken English, and a Spanish interpreter joined the conversation. The caller, later identified as Nunez, reported that he shot and killed someone who had threatened and tried to rob him. The caller told the dispatcher, "I wasn't going to let him alive and he threatened me!" He went on to say, "It's my life or his." While the caller was on the phone, a man identified as Nunez' son, Paul, could be heard in the background. Paul shouted expletives at Nunez, who sometimes responded that he had been threatened and attacked and sometimes told the dispatcher that a man was dead.

3

When Paul asked him, "What did you do?" the caller replied, "I didn't do anything! He came after me."

At about the same time as the call, Officer Donald Moore of the Wichita Police Department drove by a house on his way to another call. He saw Nunez standing in the doorway; Nunez waved and called out to him. A short time later, Moore received a dispatcher alert that a shooting had occurred at the house, and he returned and waited outside the house until other officers arrived.

As the officers approached the house, they saw Nunez and Paul standing on the front porch. Paul was holding a handgun and appeared to be very intoxicated. At the direction of the police, Paul tossed the gun away from himself. The gun had jammed, and a shell casing was projecting from the extraction port. Upon entering the front door, the officers saw a dead man, later identified as Antonio Guzman, lying face-down on the floor about 6 feet from the entrance. Three shell casings were on the hallway floor near the victim. Guzman had a small folding knife clipped to his pants. In one pocket, he had cash and a baggie containing methamphetamine. The subsequent toxicology report revealed that Guzman had relatively high concentrations of methamphetamine and alcohol in his system.

Guzman had received three bullet wounds. One was on the left side of his torso, one was on the back left side of the chest, and one was on the left side of his head. There was a bullet indentation in the floor under Guzman's body, suggesting that he had been shot at least once while he was lying on the floor. There were close contact burns, also called stippling, around the head wound.

4

Officer David Cruz talked to Nunez at the scene in Spanish, and the conversation was recorded on Cruz' body camera. Nunez told Cruz that Paul was present during the shooting: Guzman came at him with a large kitchen knife, grabbing him by the neck and holding the knife to his throat. Paul disarmed Guzman, and then "they" shot him. Nunez later told Detective Christian Cory that Guzman was reaching for his knife even after he had been shot twice and was lying on the floor.

Nunez stated that he had been robbed several times previously and he was tired of people breaking into his home, which was why he bought a gun. At the scene, he told police he shot Guzman in self-defense and in defense of his property. He told Officer Cruz, "He came in to steal. This man came in to steal and he threatened us with a, with a, and well, we defended ourselves. Well, it's my house. This man came in to steal . . . ." He went on to say, "[W]e didn't want to do that but, but he threatened me, he also grabbed me with a knife here, here on the neck and, but fortunately we took it from him and it happened and what had to happen." He concluded by saying, "Hey, well, it's my house, we're already, we're already tired officer, it's that you all also, there are many reports, and don't blame us anymore, and one has to defend themselves, what do you want, my life or his. . . . And it's my house, I'm not somewhere else, I am in my house and they came to steal and I defended myself and my son too." These statements were all volunteered by Nunez without prompting by investigators.

After police cleared the area, a search of the premises revealed evidence of drug possession. In a bedroom dresser drawer, police found a large bag and several smaller bags containing methamphetamine. They also found a digital weighing scale. Outside the house, alcohol cans and bottles were strewn around the ground. Police found a kitchen knife with a 6-inch blade lying on the ground near an outside corner of the house.

5

About four hours after the shooting, Sergeant Michael Linnehan participated in an interview with Nunez at the police station. In the course of the interview, Nunez provided three differing accounts of what transpired.

In the first account, Nunez said Paul had some friends over to the house. Nunez heard a loud disturbance coming from the front of the house, and he saw an individual whom he did not know, who would later be identified as Guzman. Guzman had Paul in a headlock and was holding a knife towards Paul. When Nunez pulled a gun from his waistband, Guzman released Paul, tossed the knife on the floor, and started toward Nunez, saying "Give me your money, give me your money." Nunez responded, "[W]e don't have any money, what are you talking about."

A couple of Paul's friends came to Nunez' aid, and there was a struggle over the gun. During the struggle, Nunez was able to transfer the gun to Paul. After Paul's friends pushed Guzman against the wall, Paul fired, causing Guzman to slump down. Nunez heard three more shots, and then there was chaos in the house. After the party guests had left, he made the 911 call.

Linnehan asked Nunez whether Guzman might have been trying to steal drugs from him, and Nunez responded that he did not have drugs in the house and he did not use drugs. But when Linnehan told him that police found methamphetamine in the house, Nunez acknowledged that, although he did not use or sell the drug, he kept some in his bedroom for a female friend.

Nunez subsequently gave Linnehan a second version of the events. He admitted it was he who shot Guzman. In this account, Guzman was attempting to rob them and was holding Paul in a headlock at knifepoint. Nunez pulled his gun from his waistband,

6

whereupon Guzman tossed the knife on the floor and tried to grab the gun. Nunez fired two shots, hitting Guzman and causing him to fall to the floor. Nunez believed Guzman was reaching for the knife, and Nunez fired one more shot. Nunez then corrected himself and said Guzman still had the knife in his hand when he went for Nunez' gun.

On further questioning, Nunez gave a third version of what happened. In this account, Paul was not present when the confrontation and shooting occurred. Guzman was armed with a knife and threatened to rob Nunez. One of Paul's friends grabbed hold of Guzman and pushed him to the floor. As the friend was pushing him away, Nunez fired two shots, striking Guzman in the midsection. Guzman fell to the floor next to the knife, which he struggled to pick up even as he was lying on the floor. Believing Guzman was reaching for the knife and intended to attack him again, Nunez shot Guzman in the head.

The State initially charged Nunez with one count of voluntary manslaughter. Nunez filed a motion for dismissal and for a declaration of self-defense immunity. The State filed a response asserting that Nunez shot Guzman while committing an inherently dangerous felony—distribution of drugs—and he was therefore guilty of felony murder and not eligible to assert self-defense immunity. The State then amended its complaint to charge one count of premeditated first-degree murder and one count of possession of methamphetamine with intent to sell.

The trial court combined the preliminary hearing with a hearing on the immunity motion. It found insufficient evidence to support a charge of felony murder but denied Nunez immunity from prosecution, finding probable cause to prosecute on homicide charges and possession of methamphetamine with intent to distribute.

7

At trial, in addition to the testimony and reports of law enforcement, jurors heard two witnesses who were at the scene of the shooting testify about what they saw. Irvin (Chavo) Rodriguez told the jury he went to the party at Nunez' house after work that day. That night, he saw someone attack Nunez with a kitchen knife. The assailant grabbed Nunez by the throat and, at knifepoint, demanded his gun. Rodriguez intervened and pushed the assailant backwards. As the assailant fell to the ground, Rodriguez started to leave out the door. He heard a gunshot and looked back inside the house, where he saw the assailant on the floor. As he left for home, Rodriguez woke up Paul, who was asleep in his van, and told him his father had shot somebody.

Christina Jones testified as a rebuttal witness for the State. She told the jury that she and her sister were friends of Paul and they sometimes spent the night at Nunez' house. The night of the party, she became angry with Nunez because he fired some random gunshots in the house, although not aiming at anyone and not trying to hurt anybody. She told him, "[N]o more," and he stopped firing. Then she relaxed on a sofa and began to feel tired, so she and her sister went to a spare bedroom and went to sleep.

She was awakened by a commotion and went out to the living room, where she saw Nunez and Guzman "going at each other." Everybody around her was saying that Guzman had a knife, and she remembered that she might have seen a knife but ultimately testified she did not see the knife. When she stepped between them and told Nunez to calm down, he pushed her out of the way. She heard a gunshot, and she and her sister ran out of the house. She said Paul was not present during the shooting, and she saw him asleep in his van when she left the house.

The jury found Nunez guilty of first-degree premeditated murder and possession of methamphetamine with intent to distribute less than 1 gram. The court sentenced him

8

to a hard 50 life sentence for the murder conviction and a concurrent term of 18 months for the drug charge. Nunez took a timely appeal to this court.

DISCUSSION

*Immunity from Prosecution*

A threshold issue is whether the trial court erroneously allowed the homicide prosecution to proceed in light of Nunez' assertion of self-defense. If Nunez had statutory immunity from prosecution, then his other issues become moot. We determine, however, that the State adequately established, and the trial court properly found, that immunity was not a bar to prosecution.

In an appeal from the denial of a motion for self-defense immunity, this court reviews the district court's findings of fact arising from disputed evidence for substantial competent evidence and reviews the ultimate legal conclusion drawn from those facts de novo. *State v. Phillips*, 312 Kan. 643, 656, 479 P.3d 176 (2021).

K.S.A. 2020 Supp. 21-5231 provides that people who use force in the defense of themselves or others or their property are immune from prosecution:

> "(a) A person who uses force which, subject to the provisions of K.S.A. 2020 Supp. 21-5226, and amendments thereto, is justified pursuant to K.S.A. 2020 Supp. 21-5222, 21-5223 or 21-5225, and amendments thereto, is immune from criminal prosecution and civil action for the use of such force . . . . As used in this subsection, "criminal prosecution" includes arrest, detention in custody and charging or prosecution of the defendant.
>     . . . .

9

"(c) A prosecutor may commence a criminal prosecution upon a determination of probable cause."

K.S.A. 2020 Supp. 21-5231 creates a "true immunity" that prevents the State from criminally prosecuting individuals who are statutorily justified in their use of force. To effectuate this immunity, district courts must perform a gatekeeping function and insulate these qualifying cases from continued prosecution and trial. A defendant invokes the district court's gatekeeping function by filing a motion under the statute, which then imposes a burden on the State to come forward with evidence establishing probable cause that the defendant's use of force was not statutorily justified. See *Phillips*, 312 Kan. at 655-56.

When considering a motion under the statute, the district court must consider the totality of the circumstances, weigh the evidence before it without deference to the State, and determine whether the State has carried its burden to establish probable cause that the defendant's use of force was not statutorily justified. A district court is to follow a two-step process when making probable cause determinations on pretrial immunity motions. First, the district court must make findings of fact based on the stipulations of the parties and evidence presented at the hearing, along with any reasonable inferences therefrom. In this first step, the district court usually must resolve conflicts in the evidence in favor of one party or the other. Second, the district court must then reach a legal conclusion as to whether the State has met its probable cause burden based on the court's factual findings. See *Phillips*, 312 Kan. at 656.

Because the immunity statute is designed to prevent prosecutions when the State fails to show probable cause that the defendant did not act in self-defense, the remedy for erroneous prosecution would be dismissal of murder charges with prejudice. Simply

10

because a jury might later find against the defendant's self-defense theory does not negate the statutory immunity. This court has explained:

> "[A] defendant's right to statutory immunity should be adjudicated at the early stages of the proceeding based on the evidentiary record submitted at the motion hearing. Otherwise, the immunity protections afforded by our Legislature would be rendered meaningless if the resolution of the immunity question, including disputed facts relevant to it, were delayed until trial. Moreover, these decisions illustrate an important difference in the injury a defendant potentially suffers as a result of immunity-related errors, compared to other trial errors. With other trial errors, the defendant's potential harm or injury relates to the fairness or legitimacy of the jury's verdict. However, in the case of immunity-related error, the potential harm or injury is the continued prosecution of the case in violation of defendant's statutory right to immunity. Quite simply, immunity error does not implicate the verdict." *Phillips*, 312 Kan. At 659.

At the preliminary hearing, which also served as a hearing on the motion for dismissal based on immunity, the trial court heard the testimony of Lori Scott, a forensic investigator. She testified that the autopsy showed that Guzman was shot in the head at an angle from behind him and the shot was fired from a close-enough range to cause stippling around the wound. Detective Cory testified about different versions of the events that Nunez gave to investigators soon after the shooting.

The trial court made the following findings regarding immunity:

> "Regarding the issue of immunity, what I did hear about the immunity was, the defendant gave three statements. And this came out during direct examination and in cross. He gave three statements. I don't know if they were all being able to say, "one, two, three," but there were three versions, so to speak. His initial statement was, according to evidence, that the victim attacked his son, and his son shot the victim; that then was

11

modified to the victim attacked his son, and he shot the victim; and then it became the victim attacked me, and I shot the victim.

". . . [T]here has been a motion for immunity filed pursuant to K.S.A. 21-5231. And in consideration of the totality of the circumstances and weighing the evidence, without deference to the State, I will find that the State has carried its burden to establish probable cause that the defendant's use of force was not statutorily justified.

"What I have is, I have information that Mr. Guzman was on the ground after being shot twice and then was shot in the head at a range where there was stippling on the wound. And based upon the evidence that I heard, I will make a finding that the State has carried its burden to establish that there's probable cause that the defendant's use of force was not statutorily justified. And that doesn't necessarily preclude a request for a self-defense instruction at the time of trial, but I'm just addressing the issue of immunity from prosecution. And I will find that the State has carried its burden to show—the probable cause burden to show that he is not entitled to statutory immunity."

A district court is not required to make any particularized findings when ruling on an immunity motion. It must be apparent from the record, however, that the district court not only recognized, but also applied, the appropriate legal standard in reaching its probable cause determination. In short, the record must show that the district court considered the totality of the circumstances, weighed the evidence without deference to the State, and resolved conflicting evidence in arriving at its legal conclusion regarding the probable cause determination. *Phillips*, 312 Kan. at 658.

Here, the trial court applied the correct legal standard. To be sure, the trial court did not make detailed, point-by-point factual findings. As Nunez points out in his brief, merely citing to inconsistent stories presented by the defendant likely would not suffice for the State to sustain its burden of showing probable cause that Nunez did not act in

12

self-defense. But the court did make the explicit finding—supported by the evidence—that Guzman was on the ground when at least one of the shots was fired into him. While that finding was not explored in detail, it was sufficient to support the probable cause finding, especially in light of the totality of the circumstances, which could include the inconsistent stories.

Although we have not defined a quantum of proof that is required from the State in order to overcome the statutory presumption of an assertion of self-defense, we determine the State's case was sufficient to proceed with prosecution.

*Involuntary Manslaughter Instruction*

Nunez' attorney requested an instruction on involuntary manslaughter under K.S.A. 2020 Supp. 21-5405(a)(4): the theory that he lawfully committed self-defense in an unlawful manner by exercising excessive force.

The State argued, and the trial court agreed, that an instruction on involuntary manslaughter was legally inappropriate because the evidence showed Nunez intended to shoot and kill Guzman. This took place shortly before this court issued its opinion in *State v. James*, 309 Kan. 1280, 1298, 443 P.3d 1063 (2019), and shortly after this court's opinion in *State v. Pulliam*, 308 Kan. 1354, 1361-62, 430 P.3d 39 (2018). Those cases undercut the basis for the trial court's rejection of Nunez' requested instruction. On appeal, the State retreats to a position that the instruction was factually inappropriate. A review of the evidentiary record demonstrates, however, that the instruction should have been given and a jury might well have selected an involuntary manslaughter option.

This court performs a four-step review of challenges to jury instructions:

13

First, the court considers the reviewability of the issue from both jurisdiction and preservation viewpoints, exercising an unlimited standard of review. Next, the court applies an unlimited review to determine whether the instruction was legally appropriate. Then, the court determines whether there was sufficient evidence, viewed in the light most favorable to the defendant or the requesting party, that would have supported the instruction. Finally, if the trial court erred, this court determines whether the error was harmless, utilizing the test and degree of certainty set forth in *State v. Ward*, 292 Kan. 541, 256 P.3d 801 (2011), *cert. denied* 565 U.S. 1221 (2012). *James*, 309 Kan. at 1297.

A defendant is generally entitled to instructions on the law applicable to his or her defense theory if the evidence sufficed for a rational fact-finder to find for the defendant on that theory. If the defendant requested the instruction at trial, the court must view the evidence in the light most favorable to the defendant. *James*, 309 Kan. at 1298.

Nunez urges this court to apply a constitutional harmlessness standard to the jury instruction in this case. This approach was explicitly rejected under similar circumstances in *James*, where the court elected to continue to apply the statutory test, and we decline to depart from the *James* analysis. Under the statutory test, the court "must be persuaded that there is no reasonable probability that the error will or did affect the outcome of the trial." *Ward*, 292 Kan. at 565. The burden of demonstrating harmlessness is on the party benefiting from the error, which, in this case, is the State. See *James*, 309 Kan. at 1302.

Here, the trial court instructed the jury on premeditated first-degree murder and the lesser offenses of intentional second-degree murder and voluntary manslaughter. The court also instructed the jury on Nunez' theory of defense of self or property, instructing:

14

"Defendant is permitted to use against another person physical force that is likely to cause death or great bodily harm only when and to the extent that it appears he reasonably believes such force is necessary to prevent death or great bodily harm to himself or someone else or his dwelling from the other person's imminent use of unlawful force entering into or remaining within his dwelling.

. . . .

"You must presume that a person had a reasonable belief that use of physical force likely to cause death or great bodily harm was necessary to prevent imminent death or great bodily harm to himself, someone else or his dwelling if you find the following: No. 1, at the time the force likely to cause death or great bodily harm was used on the individual against whom the force was used unlawfully or forcefully entered and was presently within the dwelling of the person using the force, and No. 2, the person using the force knew or had reason to believe the individual against whom the force was used unlawfully or forcefully entered and was presently within the dwelling of the person using the force.

"This presumption may be overcome if you are persuaded beyond a reasonable doubt that the person did not reasonably believe that use of force likely to cause death or great bodily harm was necessary to prevent imminent death or great bodily harm to himself or someone else."

The State objected to Nunez' request for an involuntary manslaughter-excessive force instruction, arguing that the evidence was overwhelming that the shooting was a voluntary act, so an involuntary manslaughter instruction would be legally inappropriate.

The trial court agreed with the State:

15

"[T]his instruction . . . appears to be inconsistent with the defense which states that there was a—was an intentional shooting, two shots to the body, one shot in the side of the head which would seem to be an intentional killing.

"The defendant's claim, of course, that this was in self-defense, him or me type situation. Under those circumstances and given the evidence, I think [the State] is correct that there is no evidence that this is something unintentional, that an instruction on involuntary manslaughter would be inappropriate here. So I will overrule the request of defense."

This conclusion by the trial court incorrectly stated the law, which the State concedes on appeal. The current involuntary manslaughter and culpable mental state statutes do not require admitted evidence that the killing was reckless or unintentional. *Pulliam*, 308 Kan. at 1369.

Involuntary manslaughter in the form of imperfect self-defense, that is, killing based on a "lawful act [committed] in an unlawful manner," has been characterized as a "lawful exercise of self-defense, but with excessive force," *State v. McCullough*, 293 Kan. 970, 976, 270 P.3d 1142 (2012). It was first recognized in *State v. Gregory*, 218 Kan. 180, 185-86, 542 P.2d 1051 (1975), and is based on K.S.A. 2020 Supp. 21-5405(a)(4). In *Gregory*, the court acknowledged that a defendant might kill when it was not reasonably necessary even though the defendant perceived a threat of death or great bodily harm. In such a case, the use of force could be found to be an "unlawful manner" of committing the lawful act of self-defense, thus supplying the requisite element of involuntary manslaughter. 218 Kan. at 186.

In *James*, 309 Kan. at 1298, the trial judge rejected the requested imperfect self-defense instructions based on the third step of appellate analysis, whether the instructions

16

were factually appropriate. "His interpretation of the admitted evidence was that, even under James' self-defense version, James acted intentionally, because he feared the men surrounding him." 309 Kan. at 1298. This was the same reasoning the trial judge used in the present case, and this court held it was error in *James.*

In *Pulliam*, this court recognized that, when the alleged lawful act that is a component of the crime under K.S.A. 2020 Supp. 21-5405(a)(4) is self-defense, "a jury instruction on involuntary manslaughter must be supported by evidence from which a jury could find that the defendant possessed a reasonable and honest belief that physical force was required." 308 Kan. at 1368-69.

Here, the evidence that Nunez possessed a reasonable and honest belief in the necessity of physical force to defend himself or his property, at least initially, was substantial. One testifying witness from the scene stated that Guzman had taken Nunez by the neck and was holding a blade to him, a blade that may have left the mark on Nunez' neck that was noted by law enforcement. Nunez repeatedly told law enforcement officers that Guzman had attacked him with a knife. Although it was not a kitchen knife, as described by Nunez, a boxcutter was found close to Guzman's body. And Nunez told the 911 dispatcher that it was a situation of either Nunez or Guzman surviving the attack.

To be sure, Nunez later gave conflicting accounts of what happened, and the only kitchen knife matching the description the witnesses gave was found outside the house, but we view the evidence supporting the instruction in the light most favorable to the requesting party. See *James*, 309 Kan. at 1297-98. All told, the requested instruction would have been factually appropriate. It was therefore error for the trial court to deny the requested instruction.

17

The next step in the analysis, then, is whether the error was harmless.

Under the statutory harmless error standard, the court must be persuaded that there is no reasonable probability that the error will or did affect the outcome of the trial. *Ward*, 292 Kan. at 565. In *James*, this court concluded there was no reasonable probability the instruction error affected the outcome:

> "Despite the theoretical possibility that the jury could have reached an involuntary manslaughter verdict based on imperfect self-defense, such a verdict was highly improbable. According to Gorrill's expert testimony and other witnesses, the second shot that killed McClennon appears to have hit him as he was running away from James after the first shot. Shooting an unarmed person in retreat is antithetical to self-defense, perfect or imperfect." 309 Kan. at 1304.

The circumstances in the present case are different. If the jury accepted parts of Nunez' theory of his defense that were supported by the evidence, it could conclude that Nunez was afraid for his life after being attacked by a knife-wielding assailant. Although a third party pulled Guzman off of Nunez, causing Guzman to fall down, in the short time that followed, Nunez might well have been afraid for his life, fearing that Guzman would stand back up and renew his attack, possibly using the nearby boxcutter. Nunez repeatedly told police that he saw Guzman reaching for a knife even while he was wounded and on the ground. The excessive force would consist of fatally shooting an assailant three times while the assailant was falling down or lying on the floor, but such a scenario is what imperfect self-defense is intended to address.

The State also asks this court to apply the so-called skip rule, pointing out that the jury rejected self-defense, second-degree murder, and voluntary manslaughter. The State

18

argues that the logical conclusion is that the jury would not have chosen the even-lesser offense of involuntary manslaughter.

Under this "rule," when a lesser included offense has been the subject of an instruction and the jury convicts of the greater offense, the reviewing court deems any error resulting from failure to give an instruction on another still lesser included offense to be cured. The skip rule is not actually a rule but a logical deduction that may be drawn from jury verdicts in certain cases. This court does not apply the deduction automatically or mechanically, but considers it to be one factor, among many, when analyzing instructional issues for harmlessness. See *State v. Gentry*, 310 Kan. 715, 729, 449 P.3d 429 (2019); see also *State v. Williams*, 303 Kan. 585, 600, 363 P.3d 1101 (2016) (skip rule not amenable to mechanical application, should be viewed as providing route to harmlessness when elements of crime of conviction, as compared to rejected lesser included crime, necessarily show jury would have rejected still lesser included crime).

Here, the trial court instructed on three levels of homicide:  first-degree murder, second-degree murder, and voluntary manslaughter. As instructed, the jury could have found—and did find—under the evidence that Nunez, acting with premeditation, shot Guzman with the intent to kill him. The jury also had the option, under second-degree murder, to find that Nunez intended to kill Guzman, but with no premeditation. And the jury had a third option, voluntary manslaughter. To establish that charge, the State would have to prove that Nunez knowingly killed Guzman, and the killing was predicated on either a sudden quarrel or an unreasonable but honest belief that circumstances existed justifying deadly force in defense of a person or property. See K.S.A. 2020 Supp. 21-5404.

19

The skip rule does not apply here because involuntary manslaughter, the instruction that Nunez requested, has an element not contained in the other instructions. The instruction would have directed the jury to consider imperfect self-defense involuntary manslaughter. Under K.S.A. 2020 Supp. 21-5405(a)(4), he argued that he lawfully engaged in self-defense in an unlawful manner by exercising excessive force.

This element is different from both voluntary manslaughter and second-degree murder. In particular, it differs from voluntary manslaughter in that voluntary manslaughter requires showing he had an "unreasonable but honest belief that circumstances existed" justifying deadly force. K.S.A. 2020 Supp. 21-5404(a)(2); *Salary*, 301 Kan. at 598.

Involuntary manslaughter requires a reasonable belief that the circumstances justified force, but the exercise of the force was excessive. These are two very different requirements. The jury could find that voluntary manslaughter was not appropriate but involuntary manslaughter was appropriate. The jury might well have believed that Guzman attacked Nunez with a knife and Nunez overreacted by killing him.

Without the excessive force instruction, the jury may have seen no other option than premeditated murder. With the instruction, the jury could have found that, even though the shooting was intentional, it was the result of excessive force in the form of shooting an assailant who was already wounded and fallen.

In *Pulliam,* this court considered it a realistic possibility that the jury might have accepted the defendant's theory of imperfect self-defense: despite some changes to the defendant's initial statements to detectives, he testified that he heard a gun cock and thought that he was about to be shot in the back. This testimony supported the instruction

given on the imperfect self-defense form of the lesser included offense of voluntary manslaughter. "Had the jury believed one version of Pulliam's account, it could have convicted him of killing Burton in the commission of the lawful act of self-defense in the unlawful manner of using excessive force." 308 Kan. at 1369.

The *Pulliam* court nevertheless elected not to reverse because Pulliam did not request an imperfect self-defense involuntary manslaughter instruction, which resulted in a review for clear error. Under the clear error standard, Pulliam was required to firmly convince the court that the jury *would have* reached a different verdict if it had been instructed on imperfect self-defense involuntary manslaughter, and he failed to sustain that burden of persuasion. *Pulliam*, 308 Kan. at 1370.

Here, because Nunez requested the instruction, the standard of review is inverted from that in *Pulliam*; as noted above, the court must be persuaded no reasonable probability exists that the error *will or did affect* the outcome of the trial. See *Ward*, 292 Kan. at 565.

The error may have affected the outcome of the trial because the requested instruction could have focused the attention of the jury on the legitimacy of the initial self-defense, mitigated by the subsequent exertion of unnecessary force. We conclude the error was prejudicial and reverse the murder conviction, remanding the case for further appropriate proceedings.

Because we reverse on the instruction issue, we need not rule on Nunez' other contentions of error.

21