NOT DESIGNATED FOR PUBLICATION

No. 125,443

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

ZACHARY CHRISTIAN ARNOLD,
*Appellant*.

MEMORANDUM OPINION

Appeal from Wyandotte District Court; DANIEL CAHILL, judge. Submitted without oral argument. Opinion filed August 30, 2024. Affirmed.

*Ryan J. Eddinger*, of Kansas Appellate Defender Office, for appellant.

*Kayla Roehler*, deputy district attorney, *Mark A. Dupree Sr.*, district attorney, and *Kris W. Kobach*, attorney general, for appellee.

Before PICKERING, P.J., MALONE and WARNER, JJ.

PER CURIAM: Zachary Arnold challenges his conviction for involuntary manslaughter, which arose after he engaged in a struggle with and ultimately shot and killed his father. Arnold argues that he should have been granted immunity under K.S.A. 21-5231 because he was acting in self-defense. After carefully reviewing the transcript of the hearing on Arnold's request for immunity and the parties' arguments, we find that the district court's decision was based on the correct legal framework and supported by substantial competent evidence. We thus affirm Arnold's conviction.

1

FACTUAL AND PROCEDURAL BACKGROUND

In October 2019, Kansas City police officers were dispatched to a house based on a report that Chris Arnold, the defendant's father, had been shot and killed during an argument between the two men. (This opinion uses Zachary's and Chris' first names for purposes of clarity.) Zachary was eventually charged with second-degree murder for Chris' death.

Early in the case, Zachary filed a motion seeking immunity from prosecution under K.S.A. 21-5231(a), claiming he had acted in self-defense when he shot Chris—the motion that is the subject of this appeal. The district court held a hearing on this motion concurrently with Zachary's preliminary hearing. Zachary testified, as did a detective from the Kansas City Police Department. The parties also submitted several exhibits, including an audio recording of the 911 call Zachary made after Chris had been shot, Chris' autopsy report, a video of Zachary's interview at the police station, and photographs of the scene, though none of these exhibits are part of the appellate record.

Zachary testified that the argument with his father stemmed from a recent incident between Zachary, who is a musician, and his music producer. Chris had become friends with the producer and had introduced him to Zachary, who signed with the producer's company. Zachary was scheduled to perform in downtown Kansas City, Missouri, in September 2019. But that night, the producer told Zachary that he would be unable to perform due to "a series of mishaps." Zachary initially thought the entire performance had been canceled. But he later saw "live streams from the venue of other artists," as well as other information that caused him to question the producer's statements.

Zachary discussed the situation with Chris, who volunteered to talk with the producer. Sometime later, the producer invited Zachary to the recording studio. Zachary spent an evening at the studio and believed the misunderstanding was resolved.

The next day, Zachary updated Chris on what had happened. Chris, who was a captain with the Wyandotte County Sheriff's Department, had just gotten home from an off-duty shift as a security guard. Chris was wearing a "soft uniform," which included a holster with his service firearm.

The conversation began amicably but escalated. Zachary asked Chris what he had said to the producer, and Chris said that he had told the producer "to make it sound like [Chris] had nothing to do with this" and "not to say anything to [Zachary]." Zachary was confused because he knew that Chris planned to talk to the producer; Zachary asked Chris why he would act like he had nothing to do with it.

At this point, according to Zachary, Chris "put his hand on his firearm and began stroking it with his right hand"—"mainly with the thumb and his forefingers" over the holster. Zachary testified that this gesture caused him to fear for his life. He stated that "multiple times in the past, during other arguments," Chris had pulled out a gun and pointed it "straight at" Zachary, forcing him to retreat to another room. Zachary explained that he did not call the police after these previous incidents because he did not believe it would have done any good; the police would not believe him because he had been in trouble before, and he had tried to call the police on Chris in the past, but they did not believe him after Chris told them he was with the sheriff's department. Zachary said that he had a complex relationship with his father. He described Chris as his confidante, but the two men also argued a lot; Zachary had been sent to a juvenile facility before because of physical altercations with Chris. Zachary explained that he believed the only reason Chris had not shot him in past arguments was because Chris had to retrieve his firearm from another room first—a protection that was not present during this conversation.

Zachary testified that after the first time Chris put his hand on his gun during their argument, Zachary had asked him to put the gun away. In response, Chris "[stuck] his

3

arms up on the threshold of the kitchen." Zachary said that over the course of the argument, it would go "back-and-forth": Chris would drop his hands from the doorframe and begin "re-stroking" his gun, Zachary would ask Chris to take his hand off his gun, Chris would put his hands back on the door frame for a bit, and then Chris would drop his hands again. Chris' body language concerned Zachary because Chris was "acting . . . very cold and [Zachary] wasn't able to read him very well." Zachary said he was frightened because he could not tell what Chris' "true intentions" were.

At some point, the argument became physical. Zachary was about 10 feet from Chris, and Chris had his right hand on his gun in the holster. Zachary saw Chris "move[] his left hand over to the holster" across his body. Zachary took two steps toward Chris, and Chris took a few steps back. Zachary said that he interpreted Chris' actions as "typical . . . for somebody who's trained to draw a firearm. They distance themselves, put their left hand on their holster, their right hand on their gun, begin to disengage the [lock], and pull." Zachary then "charged" Chris and covered his hands over the holster.

Zachary's testimony provided conflicting explanations for why he charged at his father. During his direct examination, he explained that he feared if the gun were to come out of the holster, Chris would shoot him. On cross-examination, however, Zachary testified that when he put his hands over Chris', Chris was trying to keep the gun in the holster.

As the struggle continued, Zachary disengaged the holster safety mechanism. He explained that he did this because he did not believe that he could keep the gun in the holster any longer. Zachary said "the gun just came straight out and was pointed straight at [him]." Zachary, who was 2 inches taller and 20 pounds heavier than Chris, said he tried to turn the gun away from him. Then "all of the sudden," Zachary heard a "pop," and Chris dropped to the floor. Zachary called 911 after Chris was shot. Chris died from a gunshot wound to the face.

4

Zachary testified that he loved and cared about his father, and he did not intend to shoot Chris or hurt him that night. But Zachary explained that he charged at Chris and tried taking control of the gun because he feared for his life. Zachary also testified that he had been diagnosed with several mental illnesses, including auditory hallucinations, paranoid schizophrenia, Asperger's syndrome, and ADHD. But he did not think these conditions affected what had occurred the night of Chris' death.

The police detective who was dispatched to the scene and interviewed Zachary also testified at the hearing. The detective explained that Zachary told him during the interview that his father's behavior was "kind of odd"; he also noted that Zachary told him that while he and Chris struggled over the gun, Chris tried to keep his gun in the holster while Zachary tried to get the gun out of the holster. But he stated that Zachary's explanation during the interview was confusing.

The detective testified that during the interview, he thought that Zachary "seemed very articulate at times for having been through what he had been through," though some of Zachary's behaviors were "odd." For example, Zachary spoke about Chris as though he were still alive, talking about the things they would do together when Chris retired. Zachary told the detective that he had been diagnosed with several mental health disorders, but the detective did not know whether Zachary's behavior that night was consistent with those diagnoses.

The detective also testified about the nature of Chris' gunshot wound. The autopsy report stated that the bullet entered near the left side of the bridge of Chris' nose and lodged just under his right ear—a trajectory traveling left to right and slightly downward. And Chris' wound had stippling, which are burn marks from the gunpowder that comes out of the barrel after the gun is shot, which typically result from a shot fired within a

two-foot range. The detective noted that he thought "[i]t would be odd for a firearm to be above the person and fired in a downward angle during a struggle."

The district court ultimately denied Zachary's request for self-defense immunity in a written ruling. While the court disagreed with the State's assertion that Zachary had been the initial aggressor in the altercation, it found that the evidence presented provided probable cause to believe Zachary was not justified in his use of force.

In particular, the court did not find certain aspects of Zachary's explanation to be credible. The court questioned Zachary's testimony about Chris pointing guns at him during past arguments because Zachary had not previously told anyone about these events and his descriptions about when these occurred were vague. The court also found that the autopsy report's description of the gunshot wound conflicted with Zachary's testimony. It noted that the trajectory of the bullet could cause a "reasonable person [to] entertain a belief that the gun was not discharged in the course of the struggle described by [Zachary]." Thus, "based on the evidence at the hearing, without any deference to the State, and considering the totality of the circumstances," the district court concluded that "there exists probable cause that [Zachary] was not justified in his use of deadly force."

The State's case against Zachary proceeded to trial. A jury found that the State had not shown that Zachary had committed second-degree murder, but the jury did find him guilty of the lesser-included offense of involuntary manslaughter. Zachary was sentenced to 32 months' imprisonment (which he had nearly completed due to his pretrial detention) and 24 months' postrelease supervision. He appeals, asserting that he was entitled to immunity from prosecution since he acted in self-defense.

DISCUSSION

Under Kansas law, a person is "justified in the use of deadly force" when they "reasonably believe[] that such use of deadly force is necessary to prevent imminent death or great bodily harm" to that person or to someone else. K.S.A. 21-5222(b). Courts have indicated that the use of force described in this statute includes both subjective and objective components. From a subjective standpoint, a defendant's use of deadly force is justified only if they "sincerely believed it was necessary to kill to prevent imminent death or great bodily harm to the defendant or a third person." *State v. Thomas*, 311 Kan. 403, 410, 462 P.3d 149 (2020). And objectively, the statutory justification only applies when "a reasonable person in the defendant's circumstances would have perceived the use of deadly force in self-defense as necessary to prevent imminent death or great bodily harm." 311 Kan. at 410-11.

A person who is justified in using force in self-defense under K.S.A. 21-5222 (and whose conduct meets other statutory requirements) is "immune from criminal prosecution and civil action" for that act. K.S.A. 21-5231(a). This statutory framework "provides not only a defense to criminal liability, but also complete immunity from criminal prosecution" and civil actions. *State v. Phillips*, 312 Kan. 643, 659, 479 P.3d 176 (2021).

When a defendant requests immunity under K.S.A. 21-5231, the State must "come forward with evidence" to show probable cause "that the defendant's use of force was not statutorily justified." 312 Kan. at 656. In doing so, the State must convince the district court that the evidence is "sufficient for a person of ordinary prudence and caution to conscientiously entertain a reasonable belief of [the] defendant's guilt despite the claim of justified use-of-force immunity." 312 Kan. 643, Syl. ¶ 3.

Practically speaking, this means the State must show probable cause that the use of force was either subjectively or objectively unreasonable. That is, the State must present

7

evidence from which a reasonable person could believe that "the defendant did not honestly believe the use of force was necessary" or "a reasonable person would not believe the use of force was necessary under the circumstances." 312 Kan. 643, Syl. ¶ 4. In determining whether the State met its burden, the district court must "consider the totality of the circumstances [and] weigh the evidence before it without deference to the State." *State v. Hardy*, 305 Kan. 1001, 1011, 390 P.3d 30 (2017).

The probable-cause burden imposed by K.S.A. 21-5231—like all probable cause determinations—is "substantially less [onerous] than the proof beyond a reasonable doubt required to obtain a guilty verdict." *Thomas*, 311 Kan. at 412. The State "does not need to prove that the defendant's use of force was not justified; it merely has to establish probable cause" that it was not. *State v. Drake*, No. 125,184, 2024 WL 657223, at *6 (Kan. App. 2024) (unpublished opinion), *rev. denied* 319 Kan. ___ (July 9, 2024). As with any probable-cause analysis, the process for determining whether the State has met this burden involves two steps. First, the district court must make findings of fact based on the evidence presented at the hearing and the parties' stipulations. *State v. Collins*, 311 Kan. 418, 425, 461 P.3d 828 (2020); *Thomas*, 311 Kan. at 413. Second, the district court must draw a legal conclusion, based on the totality of the circumstances, as to whether the State has met its burden to show the case should go forward. *Collins*, 311 Kan. at 425; *Thomas*, 311 Kan. at 413.

Appellate courts review the factual findings underlying a district court's ruling on self-defense immunity for substantial competent evidence, deferring to those findings if they are supported by legal and relevant evidence in the record. See *Phillips*, 312 Kan. at 656. We do not reweigh conflicting evidence or second-guess a district court's credibility assessments. *Hardy*, 305 Kan. 1001, Syl. ¶ 5. Because the district court's ultimate ruling as to whether immunity is warranted based on those facts is a legal conclusion, we review that conclusion de novo. *Phillips*, 312 Kan. at 656.

8

Zachary argues the district court committed a legal error by using an incorrect evidentiary lens during the immunity hearing. He asserts that despite the district court's language in its ruling, various aspects of the court's analysis show the court "functionally" viewed the evidence presented at the immunity hearing in the light most favorable to the State. Zachary points to three discussions by the district court—concerning the lack of evidence corroborating Zachary's testimony, Zachary's mental health, and the gunshot wound—and asserts that these discussions demonstrate that the court viewed the evidence and resolved all inferences in the State's favor. Zachary is correct that it is the responsibility of the State, not the defendant, to show probable cause that the defendant had not used force in self-defense within the meaning of K.S.A. 21-5222(b). See *Phillips*, 312 Kan. at 656. But after reviewing the district court's ruling and the record, we disagree with Zachary's interpretation of the district court's statements.

Zachary first challenges the district court's explanation as to why it did not find his testimony to be credible. In its written ruling, the court noted that only Zachary and Chris were present during the struggle, so the court's assessment largely rested on whether Zachary's explanation was believable. The court opined that it might have been more inclined to believe Zachary's testimony if there were some corroborating evidence, such as a "video recording of the events and they supported [Zachary's] recitation of the events." But in the absence of any such evidence, the court observed that there were several reasons why it doubted Zachary's recounting of the struggle leading to Chris' death. For example, the court did not find Zachary's testimony about how Chris had purportedly pointed guns at him in past arguments to be credible, as Zachary had never told anyone about these incidents before and his descriptions of these incidents were vague.

Zachary asserts that the district court's statement that it may have believed Zachary's version of the events if there had been a video corroborating his testimony showed that the district court erroneously believed that it was Zachary—not the State—

9

who had to come forward with evidence to prove that he acted in self-defense. But this argument removes the district court's statement from its context. The district court did not rule that Zachary was required to come forward with evidence; instead, it ruled that Zachary's explanation of what had occurred was not credible and was not corroborated by any other evidence presented at the hearing.

Next, Zachary argues that the district court's credibility assessment cannot stand because it was based in part on speculation regarding Zachary's mental condition the night of Chris' death. Zachary argues the district court should not have considered his mental health diagnoses to assess whether his perception that Chris posed a threat to his safety was reasonable. Zachary asserts that the State provided no evidence that his mental health influenced the incident. He also asserts that he had testified that he could usually read his father's social cues and that he did not believe his mental health diagnoses had any effect on what occurred. So, he concludes, the district court "once again showed deference to the State" by ignoring conflicting evidence.

This argument is also unpersuasive. There was extensive evidence presented at the immunity hearing related to Zachary's mental health on the night of Chris' death—largely through Zachary's own testimony. Zachary described his diagnoses and symptoms and admitted that those conditions were still affecting him (though he did not believe they had affected his actions that evening). The detective also testified that Zachary was behaving strangely during his interview later that night—indeed, Zachary's written argument following the immunity hearing asserted that his "untreated mental illness at the time of his police interview likely contributed to his responses to the police." While Zachary is correct that there was conflicting evidence presented regarding his mental state, the record does not show that the district court ignored Zachary's explanation; it just found the other evidence more believable. Appellate courts do not reweigh these evidentiary assessments. Accord *State v. Nunez*, 313 Kan. 540, 548, 486 P.3d 606 (2021) (noting that

a district court is not required to make particularized findings on the record when ruling on an immunity motion as long as it is apparent that it used the correct legal framework).

In his final argument, Zachary claims that the district court erred when it found Zachary's explanation of the events was inconsistent with "the nature of [Chris'] wound"—a gunshot wound to the face. Zachary asserts that the district court viewed the autopsy report in the light most favorable to the State because, other than showing the gun was pointed at Chris' face when it was fired, the report does not show whether Zachary fired that gun in self-defense. He argues that the district court could only reach that conclusion by viewing the evidence in the light most favorable to the State and ignoring any other inferences that could be drawn.

We disagree. There is a difference between viewing evidence in the light most favorable to the State and weighing the evidence and finding some—but not all— evidence compelling. When courts view the evidence in the light most favorable to the State, which a district court is not permitted to do at an immunity hearing, they may disregard conflicting evidence and focus on the evidence supporting only one outcome. See *State v. Larsen*, 317 Kan. 552, 563, 533 P.3d 302 (2023) (recognizing that reasonable fact-finders might have reached different conclusions under the facts, but a standard viewing the evidence in the light most favorable to the State focuses only on the evidence supporting the verdict). But that is not what happened here. Instead, the district court was faced with conflicting evidence regarding the events leading up to Chris' death, and the district court found the gunshot wound, which was known and described in the autopsy report, was inconsistent with Zachary's testimony. In other words, the district court weighed all the evidence and found some evidence more compelling and credible.

The detective testified at the immunity hearing that he had a hard time reconciling Chris' bullet wound—to the face and downward within close proximity—with Zachary's description of his struggle to keep the gun away from his father. While it may not have

11

been physically impossible for an injury to occur in this manner, we agree with the district court that the nature of the gunshot wound did not fit well with Zachary's explanation. Its assessment is reasonable and supported by the evidence.

After reviewing the record and the parties' arguments, we find that the district court analyzed Zachary's request for immunity using the appropriate legal standard. The court considered all the evidence presented at the hearing and found some evidence and testimony to be more credible or compelling. And ultimately, the court found based on the evidence presented that the State had shown probable cause to believe that Zachary had not been justified in his use of force against Chris. We affirm this ruling.

Before closing, we pause to note that this case demonstrates the important difference between immunity from prosecution based on self-defense under K.S.A. 21-5231(a) and the assertion of self-defense as a defense at trial. Here, the district court found that Zachary was not entitled to immunity from prosecution because there was a reasonable question as to whether he had acted in self-defense, and we affirm that ruling. But this ruling does not prevent a defendant from claiming at trial that they acted in self-defense and thus did not have the requisite mental state to commit the crime charged. Indeed, the jury at Zachary's trial heard the evidence and found Zachary was not guilty of second-degree murder or several other offenses, convicting him instead on the final lesser-included offense of involuntary manslaughter. While Zachary was not entitled to immunity for his actions, the jury presumably took into account his explanation of what had occurred and his assertion that he acted in self-defense in reaching that conclusion.

The district court did not err when it denied Zachary Arnold's request for self-defense immunity. We affirm its judgment.

Affirmed.