NOT DESIGNATED FOR PUBLICATION

No. 124,794

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

LONNIE ALONZO HOLMES,
*Appellant*.

MEMORANDUM OPINION

Appeal from Leavenworth District Court; GERALD R. KUCKELMAN, judge. Oral argument held September 20, 2023. Opinion filed March 1, 2024. Affirmed.

*Kasper Schirer*, of Kansas Appellate Defender Office, for appellant.

*Natalie Chalmers*, assistant solicitor general, and *Kris W. Kobach*, attorney general, for appellee.

Before ATCHESON, P.J., ISHERWOOD and HURST, JJ.

ISHERWOOD, J.: A jury convicted Lonnie Alonzo Holmes of aggravated kidnapping, aggravated robbery, and aggravated battery for the role he played in the exceptionally violent beating inflicted upon Major Blango. Holmes brings this appeal to assert that a *Brady* violation and prosecutorial error undermine the integrity of the jury's verdict. The *Brady* claim necessarily fails because Holmes failed to establish any resulting prejudice, and therefore, no error requiring relief. We further conclude that while the State's closing argument fell short of a comprehensive account of the DNA evidence admitted at trial, its manner of summation did not give rise to prejudice that demands reversal of the jury's verdict. As to Holmes' second claim of prosecutorial error,

that the State impermissibly commented on his credibility, we reject his contention that the challenged remarks constitute error. Accordingly, Holmes' convictions are affirmed.

FACTUAL AND PROCEDURAL BACKGROUND

One morning in late August 2019, Stephanie Rollison contacted her brother, Brent, and told him that a man by the name of Major Blango was severely beaten and left tied up in the home she shared with her then boyfriend, Antonio Garcia. She told Brent that she feared Blango might be dead. Garcia later contacted Brent separately to convey similar facts and urged him to go to the residence to see what occurred. Brent agreed to investigate and took his friends, James Ruch and Arlando Dangerfield, along.

Once inside the residence, Brent found Blango hogtied, bloody, and incoherent but conscious. A considerable amount of blood and hair littered the room where Blango was attacked. Brent and his friends transported Blango to the hospital but told the security guard they found him alongside the road.

Sometime later, law enforcement officers contacted Brent and he acknowledged that he actually found Blango at his sister's home. Stephanie also spoke with the officers and provided a recorded statement. She informed them that she saw Lonnie Holmes, William Dickerson, and Cory Walker together at the home of a mutual friend and while they were there, Garcia arrived, and an argument ensued between him and Holmes. Garcia decided to leave, but before he could do so, someone threw a brick or rock at his vehicle. Several hours later, Stephanie overheard Holmes say that when he found Garcia, he intended to cut off his hair. Additional time passed and she picked up on a remark uttered by one of the men that someone needed to check on Blango to see whether he was still alive. It was that comment which prompted her to seek out her brother's help.

2

Holmes was eventually arrested and charged with aggravated kidnapping, aggravated robbery, and aggravated battery. The case proceeded to a jury trial and the State called Blango to recount the assault he endured. Blango testified that he and Garcia were together on the evening preceding the early morning attack, and an altercation broke out between Garcia and Holmes due to an incident involving a brick or a rock. Garcia and Blango then went to Garcia's house where they remained for a few hours until Garcia left in the early morning hours under the guise of going to pick up his children. Once Garcia was gone, Blango reached out to Holmes, via Facebook messenger, and told him he did not have anything to do with the issues between him and Garcia. Holmes responded and assured Blango he had nothing to worry about and everything would be just fine.

Holmes' assertions rang hollow. A few hours after Holmes attempted to put Blango's mind at ease, he and Dickerson banged on the door of Garcia's house. When Blango opened the door, Holmes pointed a gun at him, and the two men forced their way inside. While Holmes held Blango at gunpoint, Dickerson went through his phone to ascertain whether Blango had anything to do with a different brick-throwing incident.

Dickerson came upon something that prompted him to inform Holmes, "Yeah, he had something to do with it." At that point, a fight ensued, and while Blango struggled with Dickerson, Holmes repeatedly struck Blango with a crowbar. The two intruders eventually overpowered Blango and forced him to a back room of the house where they cut his finger, cut his hair off, continued to beat him, and tied him up. The next thing Blango remembered was being taken to the hospital and eventually waking up there.

Rachel Hunt, a forensic scientist for the Kansas Bureau of Investigation, also testified as a witness for the State. According to Hunt, she received several items from the scene which possibly contained DNA evidence and she tested those items for both blood and touch DNA. Hunt explained that touch DNA refers to trace amounts of DNA

that may remain after someone touches an item, whereas blood DNA is found in blood remnants and typically provides a much better source for DNA testing.

During the testing process, Hunt uncovered Blango's DNA as part of a mixed profile found on two pieces of electrical cord recovered from the scene. Blango was the major profile—the person contributing the most DNA—on both pieces of evidence.

On cross-examination, Hunt testified that some additional DNA profiles were found but they were not consistent with any of the known DNA samples provided to her. She explained that she was never provided with known DNA samples from Holmes or Dickerson, but if she had received additional known samples, she could have performed additional testing. Thus, because she did not have such a sample from Holmes, she could not make any statements regarding his possible contribution to any of the DNA profiles.

Leavenworth Police Detective Tesh St. John testified concerning the meeting he had with Blango the day that he was admitted to the hospital. According to St. John, Blango was difficult to communicate with, struggled to recall specifics about the incident, and was not very cooperative. The State inquired whether it was fair to say that the detective tried to speak with Blango but was "not able to talk to him much," and St. John agreed that was fair. St. John further testified that a few days after that first meeting, he received a call from Blango's girlfriend, Lindsay Hanson, who told him that Blango was prepared to provide a formal statement. St. John met Blango and Hanson at a hotel where they were hiding.

According to St. John, Blango's version of events was that he was with Garcia in Garcia's minivan, and they stopped to talk to someone. Holmes and Dickerson were nearby, and when Garcia and Holmes spotted one another a verbal altercation erupted, so Blango and Garcia left. Later, they returned to the same location, and Holmes threw a brick at the van as they drove by. Garcia and Blango left and went to the home Garcia

4

and Stephanie shared. While they were there, Garcia expressed a desire to retaliate but Blango declined to participate. Blango told the detective that Holmes and Dickerson later showed up at the back door of Garcia's home looking for Garcia. The men told Blango that if he wanted to prove he did not have anything to do with the situation then he should let them in so they could look for Garcia. Blango allowed the men to come inside.

Blango told St. John that once Holmes and Dickerson realized Garcia was not in the house, Holmes directed his ire at Blango and struck him with a crowbar. At one point, Holmes complained that Blango's hair was impeding the beating he was attempting to deliver, so Dickerson passed a large kitchen knife to Holmes who then used it to cut Blango's hair. Once a portion of Blango's hair was removed, Holmes resumed battering him about the head with the crowbar. Frustrated that Blango continued to resist, Holmes cut Blango's finger with the knife. Once satisfied with the extent of the beating they inflicted, Holmes and Dickerson tied Blango's arms and legs behind his back, gagged him, and left. Blango was alone in the residence until Brent arrived and took him to the hospital.

During cross-examination, St. John clarified that the hospital interview was about 45 minutes long and that as they were talking, Blango "seemed to kind of start remembering some things." Defense counsel then learned there was an audio recording of the interview that was not provided to him. On redirect, St. John testified that Blango told him, during the interview, that Holmes and Dickerson were the ones who attacked him.

The following day, the third day of trial, the State provided defense counsel with a copy of the recorded hospital interview, as well as a letter addressed to a different prosecutor from David Kelly, one of Holmes' witnesses. Defense counsel asserted that the new evidence raised potential *Brady* concerns. The court asked defense counsel to review the new evidence and determine whether "it matters to the case or not, and perhaps you can file an appropriate motion before the day is out so that we could take

5

that up." No further proceedings occurred in Holmes' case that day due to a juror's medical emergency.

The parties reconvened the next morning and the court asked defense counsel if he had any issues he wanted to raise. Defense counsel responded, "I mean, I did receive some evidence from the State after they closed their case. Not sure if now is the appropriate time to make any motions or if it was until after . . . ." The district court told counsel that if he was not ready to litigate the matter, they could take it up at the appropriate time.

Holmes commenced his case-in-chief by calling Detective St. John as a witness. The detective explained that when he interviewed Blango at the hospital, Blango's girlfriend, Hanson, was present, and she was the first person to mention Holmes' name. St. John agreed that Hanson frequently interjected and actively questioned Blango throughout the detective's time with them. He also acknowledged that he remarked to Blango and Hanson, during the interview, that the attack was the type of thing Holmes would normally do, but it seemed out of character for Dickerson.

Holmes opted to testify on his own behalf and denied any involvement in the acts perpetrated against Blango. He told the jury that he did not see Garcia or Blango on the day of the attack and never went to the residence where it happened.

David Kelly was Holmes' next witness and testified that he was in custody with Blango while the charges were pending against Holmes in this case. Kelly claimed that Blango told him that he did not actually know who attacked him and the idea to blame Holmes was originally proposed by Detective St. John, who was friends with Blango's girlfriend's father. Kelly also asserted that Blango pointed an accusatory finger at Holmes because he believed Holmes was sleeping with the mother of his children. Finally, according to Kelly, Blango also expressed feeling conflicted because Holmes allegedly

would pay him to not testify, but if he declined to testify against Holmes, he would get his probation revoked and sent to prison.

Kelly explained that he wanted to use the information he acquired from Blango for his own benefit. So, he wrote a letter to the prosecutor assigned to his own case and offered to not testify in Holmes' defense in this case in exchange for benefits in his own cases.

Holmes rested his case, the parties made their closing arguments, and the jury found Holmes guilty on all charges. Holmes timely moved for a new trial and argued that the State violated the *Brady* doctrine when it failed to disclose the recording of the hospital interview until the middle of the trial and after the witness testified and was released from his subpoena. Several days later, Holmes amended his motion and argued that the late disclosure of Kelly's letter compounded the *Brady* violation. The State countered that the prosecutor did not receive the recording of the interview or discover the letter until shortly before the items were turned over to defense counsel. Following a hearing, the district court agreed that *Brady* issues present serious cause for concern, but in this case, Holmes was not prejudiced by the manner of disclosure. The district court then sentenced Holmes to a controlling term of 290 months' imprisonment.

Holmes now brings his case to this court with a request to analyze his claims that *Brady* violations and prosecutorial error compromised his right to a fair trial and warrant reversal of his convictions.

*The district court did not abuse its discretion when it denied Holmes' motion for a new trial.*

Holmes' first claim of error is that the State violated his due process rights under *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963), by failing to timely disclose a recording Detective St. John made of his interview with Blango at the hospital and a letter Kelly sent to the prosecutor assigned to his own case.

To recap, it was during defense counsel's cross-examination of the case detective that Holmes' counsel, and apparently the State, became aware there was a recording of the detective's interview with Blango that was not turned over as part of discovery. The following day, the third day of trial, the State provided Holmes' attorney with a copy of the recorded interview, along with a recently discovered letter that David Kelly, one of Holmes' witnesses, wrote to the prosecutor assigned to his own case.

Holmes took no initiative to have the evidence excluded at that time. Rather, he proceeded with his case-in-chief and called Detective St. John as his first witness at which time he played the recording for the jury and questioned St. John about its contents. Holmes' attorney also called Kelly as a witness and took the opportunity to question him about the letter and the statements Blango made during their time together in custody.

Holmes was convicted and defense counsel filed a motion for new trial relying on a purported *Brady* violation as its foundation. The district court agreed that the State's conduct was problematic but concluded that Holmes suffered no prejudice as a result given that he was able to make use of the evidence during his case-in-chief.

*Holmes argues that the incident amounted to a* Brady *violation that demands reversal of his convictions for a new trial.*

*Standard of Review*

Review of Holmes' claim of error requires a dual pronged analysis as it involves the denial of a motion for new trial grounded in a *Brady* violation. "A trial court's determination as to the existence of a *Brady* violation is reviewed de novo with deference to the trial court's findings of fact, but the trial court's denial of the defendant's motion for new trial is reviewed under an abuse of discretion standard." *State v. Warrior*, 294 Kan. 484, Syl. ¶ 13, 277 P.3d 1111 (2012); see also *State v. Williams*, 303 Kan. 585, 595, 363 P.3d 1101 (2016). A judicial action constitutes an abuse of discretion if it is (1) arbitrary, fanciful, or unreasonable; (2) based on an error of law; or (3) based on an error of fact. *State v. Levy*, 313 Kan. 232, 237, 485 P.3d 605 (2021). The party asserting the district court abused its discretion bears the burden of showing such abuse occurred. *State v. Keys*, 315 Kan. 690, 708, 510 P.3d 706 (2022).

*Preservation*

Before proceeding with an analysis of the merits that Holmes relies on to support his claim, we must first resolve the parties' competing arguments concerning whether this issue is even properly before us for review. First, as a general rule, a party may not raise a constitutional claim, like a *Brady* violation, for the first time on appeal. See *State v. Godfrey*, 301 Kan. 1041, 1043, 350 P.3d 1068 (2015); *State v. Anderson*, No. 114,447, 2016 WL 3961436, at *3 (Kan. App. 2016) (unpublished opinion). There are exceptions to this rule, which include: (1) The newly asserted theory involves only a question of law arising on proved or admitted facts and is finally determinative of the case, (2) consideration of the theory is necessary to serve the ends of justice or to prevent denial of fundamental rights, and (3) the district court was right for the wrong reason. *State v. Johnson*, 309 Kan. 992, 995, 441 P.3d 1036 (2019). "But just because an exception may

9

permit review of an unpreserved issue, this alone does not obligate an appellate court to exercise its discretion and review the issue." *State v. Parry*, 305 Kan. 1189, 1192, 390 P.3d 879 (2017). The decision to review an unpreserved claim under an exception is a prudential one. Even if an exception would support a decision to review a new claim, this court has no obligation to do so. *State v. Gray*, 311 Kan. 164, Syl. ¶ 1, 459 P.3d 165 (2020).

For its part, the State argues that Holmes failed to fulfill the preservation obligation because he did not pursue a *Brady* claim in any formal way until after the trial concluded and he was convicted. As the State puts it, Holmes had the chance to address any possible issues during the remainder of the trial but opted to forego that opportunity. Holmes asserts that even if he failed to properly preserve the issue for appeal, this court should address the claim because it implicates his fundamental constitutional rights and involves a pure question of law. We are satisfied that Holmes has sufficiently invoked two exceptions to the general rule and will exercise our discretion to move forward with a resolution of his claim on its merits.

In *Brady*, the United States Supreme Court held that prosecutors have a duty to disclose evidence favorable to the accused when "the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87. Further, "because law enforcement's knowledge of evidence is imputed to the State, a *Brady* violation can occur when the prosecutor withholds material evidence that is not known to the prosecutor but is known to law enforcement." *Warrior*, 294 Kan. at 506. *Brady* defines the Government's minimum duty under the Due Process Clause to ensure a fair trial. See *United States v. Campagnuolo*, 592 F.2d 852, 860 (5th Cir. 1979).

There are three essential elements to a *Brady* violation claim. First, the evidence at issue must be favorable to the accused, either because it is exculpatory, or because it can be used as impeachment evidence. Second, the evidence must have been suppressed by

the State. And third, the "evidence must be material so as to establish prejudice." *Warrior*, 294 Kan. at 506. "[E]vidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *United States v. Bagley*, 473 U.S. 667, 682, 105 S. Ct. 3375, 87 L. Ed. 2d 481 (1985). A determination of the materiality of withheld evidence must be made "collectively, not item by item." *Kyles v. Whitley*, 514 U.S. 419, 436, 115 S. Ct. 1555, 131 L. Ed. 2d 490 (1995). In *Warrior*, our Supreme Court concluded that the reasonable probability test essentially asks: "[D]oes the evidence put the whole case in such a different light as to undermine confidence in the verdict?" 294 Kan. at 511. In Holmes' case, it is unnecessary to devote analytical resources to the first two prongs because Holmes is unable to establish prejudice under the third prong.

Holmes takes the position that because the evidence was belatedly disclosed, he lost the ability to confront Blango with the evidence. That is, he was effectively stripped of his right to confront the complaining witness and, as such, he was unarguably prejudiced. In support of this contention, he directs our attention to *Crawford v. Washington*, 541 U.S. 36, 62, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004), where the United States Supreme Court held that "[d]ispensing with confrontation because testimony is obviously reliable is akin to dispensing with jury trial because a defendant is obviously guilty" which is "not what the Sixth Amendment prescribes." Holmes argues that the district court similarly ran afoul of the Sixth Amendment by finding that his ability to question St. John and Kelly alleviated any prejudice he suffered by not being able to cross-examine Blango with the recorded statement and letter. Holmes essentially argues that his inability to cross-examine Blango with the belatedly disclosed evidence amounts to structural error, but he fails to tether his argument to any supporting authority that is directly on point.

11

The type of disclosure that occurred here does not amount to structural error. Rather, Holmes is bound by the long-standing *Brady* elements test which requires him to establish the materiality of the evidence at issue. See *State v. Hirsh*, 310 Kan. 321, 337, 446 P.3d 472 (2019). Holmes' efforts to fulfill this obligation fall short. He attempts to gird his claim with several speculative and hypothetical questions that the jury "likely" had about Stephanie and her brother, Brent, and other inquiries they "likely" had about Garcia and Dickerson. But the list of potential questions he conjures are largely unrelated to the recorded interview between the detective and Blango or Kelly's letter. Holmes also contends that he "should have been able to impeach" Blango's testimony with the recorded interview and Kelly's letter, but we find this argument unpersuasive given that he failed to take any affirmative steps to even attempt to have Blango brought back to trial once he learned of the evidence.

Holmes' claim of prejudice is also undermined by the fact that he used the evidence during his case-in-chief as soon as it was made available to him. As a result, the jury had the opportunity to hear the entire recorded interview as well as the detective's testimony about the recording. The jury then also had the benefit of receiving Kelly's testimony which covered the statements Blango allegedly made to him while they were in custody together and the contents of the letter he penned to the prosecutor in his case.

The question at this step is not "whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles*, 514 U.S. at 434. In sum, Holmes fails to establish that the trial he received fell short of the fair one to which he is entitled nor do his contentions lead us to question the integrity of the jury's verdict. Accordingly, his claimed *Brady* violation does not demand reversal of his convictions.

*The prosecutor committed a single error during closing arguments, but that error was harmless and did not compromise Holmes' right to a fair trial.*

Holmes presents a two-fold claim of prosecutorial error that requires reversal of his convictions. First, he contends that, during closing argument, the prosecutor misstated an aspect of the testimony related to DNA evidence. Next, he challenges a portion of the prosecutor's remarks as impermissible comments on Holmes' credibility.

### *Standard of Review*

Reviewing courts employ a two-step process to evaluate claims of prosecutorial error: error and prejudice. *State v. Sieg*, 315 Kan. 526, 535, 509 P.3d 535 (2022).

> "To determine whether prosecutorial error has occurred, the appellate court must decide whether the prosecutorial acts complained of fall outside the wide latitude afforded prosecutors to conduct the State's case and attempt to obtain a conviction in a manner that does not offend the defendant's constitutional right to a fair trial. If error is found, the appellate court must next determine whether the error prejudiced the defendant's due process rights to a fair trial. In evaluating prejudice, we simply adopt the traditional constitutional harmlessness inquiry demanded by *Chapman* [*v. California*, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967)]. In other words, prosecutorial error is harmless if the State can demonstrate 'beyond a reasonable doubt that the error complained of will not or did not affect the outcome of the trial in light of the entire record, *i.e.*, where there is no reasonable possibility that the error contributed to the verdict.' [Citation omitted.]" *State v. Sherman*, 305 Kan. 88, 109, 378 P.3d 1060 (2016).

### *Discussion*

It is incumbent upon the State to ensure its closing arguments "'accurately reflect the evidence.'" *State v. Longoria*, 301 Kan. 489, 524, 343 P.3d 1128 (2015) (quoting *State v. Raskie*, 293 Kan. 906, 917, 269 P.3d 1268 [2012]). In addition, a prosecutor commits error "'by making arguments that dilute the State's burden of proof.'" *State v.*

13

*Thomas*, 307 Kan. 733, 743, 415 P.3d 430 (2018). Appellate courts "may consider the presence or absence of a contemporaneous objection in analyzing an instance of alleged prosecutorial error." *State v. Blevins*, 313 Kan. 413, 428, 485 P.3d 1175 (2021).

*Statements on DNA Evidence*

Holmes' first claim of error arises from the State's discussion of the DNA evidence in a portion of its closing argument. During summation, Holmes' counsel highlighted the fact that the State neglected to collect a sample of Holmes' DNA for testing. During its rebuttal, the State endeavored to counter those remarks by virtue of the following statements:

> "Now, the defense talks about the DNA and that they didn't get the DNA from the defendant. But what they did do—and look at the DNA evidence that you heard from Rachel Hunt. Rachel Hunt tells you that blood is going to be the primary source of the DNA, like, through what they get there, and touch DNA will a lot of times be drowned out by that.

> "Remember, touch DNA is just . . . did I just leave DNA on the table? That's it. Blood soaked in that room is going to be overwhelming on that. And what you look at with that as well is with the DNA, was there ever any injuries to Holmes or Dickerson? No one ever said there was. The only thing you would have back there would be touch DNA if they have it.

> "And what did they take with them? Well, the items they took from Major Blango they took with them. The crowbar they took with them, 'cause that wasn't found on the scene. The phone, that wasn't found on scene. They took that with them. The gun, that wasn't found on scene. They took that with them. So anything they brought with them that was theirs, their possessions, they took with them."

Breaking these statements down, the State first asserted that Hunt's testimony included the comment that "a lot of times" touch DNA will be drowned out by blood DNA. The prosecutor then went on to say that only touch DNA would exist with respect to Holmes or Dickerson because there was no evidence either of those two men suffered any injuries during the attack. Finally, the State explained that the crowbar, phone, and gun were not recovered from the scene and that the attackers took their possessions with them. A fair review of the record verifies the accuracy of each of those statements.

But, returning to Hunt's testimony, she also stated there was an unknown individual whose DNA profile was collected on swabs from the bathroom sink handles and soap bottles in the residence, and one who contributed DNA to a sample recovered from a piece of electrical cord that was taken into evidence at the scene of the attack. She described the DNA evidence from the electrical cord as a mixed profile, from which Blango could not be excluded as the major contributor. The profile for the minor contributor, however, was not consistent with any of the known DNA profiles provided to her. Hunt testified that if she had received additional profiles to use for comparisons, she could have done so.

This aspect of Hunt's testimony somehow did not make it into the State's summation of the DNA evidence and, even though defense counsel voiced no objection or sought to flesh out the record, we find that void deprived the jury of a complete and transparent accounting of that evidence. As a result, it amounts to error on the part of the State. But as indicated by our standard of review, our analysis does not end there. The next question we must resolve is whether the argument was harmless. To be characterized as such, the State must be able to demonstrate that the error complained of did not affect the outcome of the trial in light of the entire record, or in other words, that there is no reasonable possibility that the error contributed to the verdict. *Sherman*, 305 Kan. at 109.

To satisfy its burden, the State argues that Holmes' testimony that he was neither present for nor involved in the attack on Blango was undermined by other evidence introduced at trial. In support of that assertion, it highlights Blango's identification of Holmes as one of his attackers and Stephanie's first statement to law enforcement officers, close in time to the incident, which placed Holmes and Dickerson together and included Holmes' statement that he intended to cut off Garcia's hair once he found him. The State then buttresses this evidence with the statement Ariel Cheatham provided to officers which essentially corroborates Stephanie's claim that Holmes and Dickerson were together the night of the incident. Finally, the State points out the contradiction between Holmes' testimony that there was no damage to the vehicle and that of the two officers who saw the damaged car in front of Holmes' girlfriend's house and testified to the same.

The fleeting nature of the prosecutor's erroneous argument, the several witnesses who contradicted Holmes' general denials, either at trial or through earlier police interviews, the lack of a contemporaneous objection, and the instructions given to the jury directing it to resolve the case on the evidence introduced at trial and that arguments of the parties do not constitute evidence, leads us to conclude the error was harmless under the circumstances. See *Sherman*, 305 Kan. at 109.

*Argument Regarding Holmes' Credibility*

In his next claim of error Holmes essentially contends that the prosecutor impermissibly commented on his credibility in the following portion of its closing statements:

> "Now, why is he testifying? What's his motive? Well, 'cause he's here. He's sitting in front of you. He's trying not to get in trouble. That's it.

16

"So when you look at the credibility of the defense, that's what you look at. Why is he testifying? Why is he denying just everything? Not knowing people. Not talking to anybody. That's not what all of them said two years ago."

It is a long-standing rule that when reviewing courts engage in an assessment of whether a particular statement falls outside of the wide latitude given to prosecutors, they consider the context in which the statement was made, rather than analyzing it in isolation. *State v. Ross*, 310 Kan. 216, 221, 445 P.3d 726 (2019); see *State v. Stone*, 291 Kan. 13, 19-20, 237 P.3d 1229 (2010). This case offers a good illustration of why that directive exists. The portion of the prosecutor's closing from which the challenged remarks are excised was quite lengthy and specifically devoted to helping the jurors understand Jury Instruction Number 5, regarding the credibility of witnesses. In explaining that responsibility, the prosecutor suggested an internal checklist they might work through to accomplish that task. Such as, considering what the witnesses testified to and their demeanor while on the stand, why they are testifying, or their motivation for doing so, and how their statements compare to the evidence and testimonies offered by other witnesses.

With that as their backdrop, the prosecutor walked them through each of the witnesses called at trial, the content of their testimonies, their respective motivations in testifying, and various behaviors they exhibited—Stephanie, Brent, Blango, law enforcement officers, David Kelly, and finally, Holmes. The record reflects that the statements Holmes brings to us to analyze were made as part of a greater narrative focused on the concept of credibility, rather than a coordinated attack on Holmes in isolation.

Additionally, K.S.A. 60-420, which allows a party to attack or support the credibility of a witness, states:

17

"Subject to K.S.A. 60-421 and 60-422, for the purpose of impairing or supporting the credibility of a witness, any party including the party calling the witness may examine the witness and introduce extrinsic evidence concerning any conduct by him or her and any other matter relevant upon the issues of credibility."

One of the methods or techniques for attacking the credibility of a witness is to show partiality, including bias, motive, and interest in the outcome. See 3 Barbara, Kansas Law and Practice: Lawyer's Guide to Kansas Evidence § 3.1, p. 59 (5th ed. 2007). Our Supreme Court has held: "Bias, interest, or improper motives of a witness may always be shown in order to place the witness' testimony in proper perspective." *State v. Bowman*, 252 Kan. 883, Syl. ¶ 1, 850 P.2d 236 (1993). "[E]vidence of bias or prejudice of a witness is relevant and may be shown on cross-examination or in rebuttal or by other witnesses or evidence." *Lindquist v. Ayerst Laboratories, Inc.*, 227 Kan. 308, Syl. ¶ 2, 607 P.2d 1339 (1980). Holmes is not insulated from the application of this principle simply because he was the criminal defendant in this case. A defendant who testifies on his or her own behalf does not enjoy unlimited protection. *State v. Massey*, 247 Kan. 79, 82, 795 P.2d 344 (1990). Rather, the State has the right to point out possible biases a witness may have had for testifying. *State v. Hill*, 28 Kan. App. 2d 28, 38, 11 P.3d 506 (2000). As the fact-finders, a jury must necessarily resolve conflicting evidence and by extension, who to believe. "It is not error to tell the jury—even colloquially—that it must weigh the evidence and make any necessary credibility determinations to resolve conflicting evidence." *Williams*, 303 Kan. at 603. In *Williams*, the final statement the prosecutor left the jury to consider was to "[t]est [Williams'] story and the motivation to telling you something other than what is accurate." 303 Kan. at 602. On review, our Supreme Court rejected Williams' claim of prosecutorial error, finding that the statement "simply asks the jury to weigh Williams' testimony against the other evidence presented. This kind of argument is permissible and is not error." 303 Kan. at 604. We believe Holmes' case warrants a similar finding.

Prosecutors are given wide latitude to craft arguments that include reasonable inferences based on the evidence. When a case turns on which version of two conflicting stories is true, it may be reasonable to argue that certain testimony is not believable, so long as the ultimate conclusion on credibility is left to the jury. *State v. Williams*, 46 Kan. App. 2d 36, 46-47, 257 P.3d 849 (2011). For example, it is "not improper" for a prosecutor to offer "comments during closing arguments regarding the witness' motivations to be untruthful." *State v. King*, 288 Kan. 333, 353, 204 P.3d 585 (2009). He or she must simply do so without stating their own opinion of a particular witness' credibility. *State v. Pribble*, 304 Kan. 824, 835, 375 P.3d 966 (2016). The prosecutor did not violate that prohibition here.

Holmes' version of events offered a significantly different account from that of the State's witnesses, thus, the case obviously turned in some measure on the jury's assessment of witness credibility. When reunited with their surrounding context it becomes clear that the challenged remarks were not improper. Rather, the greater goal of the scrutinized portion of the State's closing, in its entirety, was simply to outfit the jurors with tools they could use to determine which explanation was the most plausible.

Holmes presented two claims of prosecutorial error for our consideration. We only share his conclusion with respect to one of those allegations, the manner in which the prosecutor summarized the DNA evidence. Even so, that error was harmless and does not demand reversal of Holmes' convictions.

*The cumulative error doctrine does not apply in Holmes' case.*

For his final argument on appeal, Holmes contends that if any one error did not warrant reversal of his convictions, then the cumulative effect of multiple errors should.

Under the cumulative error doctrine, we may reverse a case when the totality of the circumstances demonstrate that a defendant was substantially prejudiced by cumulative errors and denied a fair trial. *State v. Holt*, 300 Kan. 985, 1007, 336 P.3d 312 (2014). A single error cannot support reversal under this theory because there simply is nothing for us to aggregate. See *State v. Gonzalez*, 307 Kan. 575, 598, 412 P.3d 968 (2018). Because we have only identified a single harmless error in Holmes' case, the cumulative error doctrine does not apply.

Affirmed.

* * *

ATCHESON, J., concurring: We properly affirm the convictions of Defendant Lonnie Alonzo Holmes in a jury trial in Leavenworth County District Court for the kidnapping and savage beating of Major Blango and the resulting sentences he received. While I concur fully with that outcome, the lead opinion takes too narrow a view in analyzing Holmes' claim of cumulative error. We should consider any prejudice flowing from both the prosecutorial error in closing argument and the putative *Brady* claim. Having done so, I see no basis for reversing the jury's verdicts.

Appellate courts will weigh the aggregated impact of trial errors and may reverse a conviction if the "cumulative error" has deprived the defendant of a fair hearing even when the errors considered individually would not necessarily require relief. *State v. Couch*, 317 Kan. 566, 597, 533 P.3d 630 (2023); *State v. Smith-Parker*, 301 Kan. 132, 167-68, 340 P.3d 485 (2014). An appellate court examines the entire trial record to assess the effect of multiple trial errors. 301 Kan. at 167-68. The assessment takes account of "how the trial judge dealt with the errors as they arose; the nature and number of errors and their interrelationship, if any; and the overall strength of the evidence." *State v. Miller*, 308 Kan. 1119, 1176, 427 P.3d 907 (2018).

20

When the heightened review for constitutional error applies to one of the errors—as it does for the prosecutor's misstatement in closing argument—that standard also governs the cumulative error analysis. *State v. Thomas*, 311 Kan. 905, 914, 468 P.3d 323 (2020). As the party benefiting from the errors, the State must persuade us beyond a reasonable doubt the jurors would have come to the same result without the miscues. *Couch*, 317 Kan. at 597; *Thomas*, 311 Kan. at 914.

As a matter of analytical consistency, we ought to consider the claimed *Brady* violation in our cumulative error assessment even though we declined to determine if there was, in fact, a violation. Whether the State's revelation of exculpatory evidence in the midst of a jury trial amounts to a *Brady* violation or merely to an unfortunately late disclosure can be a difficult determination bound up in particular circumstances. See *State v. Breitenbach*, 313 Kan. 73, 98, 483 P.3d 448 (2021). Rather than undertaking that task, we have simply looked at any possible prejudice to Holmes from the untimely disclosures of a detective's taped interview with Blango and a letter from David Kelly, a defense witness, to another prosecutor seeking a benefit in his own case if he were to conveniently be unable to testify in Holmes' trial. Kelly did testify and told the jurors Blango had said he falsely accused Holmes. We found minimal, if any, prejudice to Holmes under the circumstances and denied relief on his *Brady* claim because a violation would have amounted to harmless error.

But having deferred on the predicate determination, we ought to consider any resulting prejudice in our cumulative error analysis. Cf. *Couch*, 317 Kan. at 597-98 (court considered unpreserved instructional error in cumulative error analysis). The exercise, however, does not materially advance Holmes' cause.

Although Blango testified and had been released from his subpoena before the recorded interview was disclosed during trial, Holmes can show no resulting prejudice. The jurors saw Blango testify and heard the recorded interview. They could weigh the

21

two accounts in assessing Blango's credibility and, in turn, in measuring his credibility against Holmes'. Moreover, Holmes' lawyer did not attempt to recall Blango as a witness at trial—an appearance that would have allowed Blango to explain any real or imagined discrepancies between his testimony and the interview and in doing so to recount at least some of the horrific aspects of the beating inflicted on him. In sum, there was no demonstrable prejudice to Holmes, given how the disclosure of the recorded interview with Blango unfolded.

Just how the untimely disclosure of the letter from Kelly to the prosecutor's office prejudiced Holmes is a mystery to me. Holmes' lawyer identified Kelly in a court filing four days before the trial as a likely defense witness, so there was no surprise in that respect. During the trial, Holmes' lawyer could not have impeached Blango with the letter as a prior inconsistent statement because Blango did not write it. After the letter came to light, Holmes' lawyer called Kelly to testify to Blango's purported false accusation—consistent with the content of the letter. The jurors plainly found Kelly and his claim less than credible.

The other error rests on a portion of the prosecutor's closing argument that materially mischaracterized why there was no DNA evidence implicating Holmes. The prosecutor implied there was no DNA evidence found at the scene suitable for comparison. But the forensic analyst testified that a recovered DNA sample could have been compared had she been provided with a known DNA profile for Holmes. The jurors, therefore, knew why there had been no DNA comparison. As it was, the DNA evidence presented at trial proved neither inculpatory nor exculpatory. And we have no reason to assume the jurors treated it any other way. So the State's closing argument, though prosecutorial error, was not functionally prejudicial to Holmes.

Neither of the cumulative errors I consider—the untimely disclosure of evidence and the prosecutor's closing argument—prejudiced Holmes' right to a fair trial in any

material way. Moreover, they were not interlocking errors that would have had a catalytic effect exponentially or even substantially increasing their prejudice when considered together. See *Couch*, 317 Kan. at 598; *State v. Conaway*, No. 121,848, 2021 WL 4704029, at *7 (Kan. App. 2021) (unpublished opinion). They were neither prejudicial alone nor cumulatively, so I am persuaded beyond a reasonable doubt they did not deprive Holmes of a fair trial. If I had reached the opposite conclusion, I would then have to decide whether the untimely production of the evidence constituted a *Brady* violation—a necessary determination for there to have been a trial error in the first place. But I am spared that exercise.

For the reasons I have outlined, I agree with the broad proposition Holmes has not presented a claim for cumulative error that warrants relief.

\* \* \*

HURST, J., concurring: While I join with the majority in affirming Lonnie Alonzo Holmes' convictions, I also join Judge Atcheson's concurrence addressing the claim of cumulative error to include Holmes' *Brady* violation allegation.